No. 49.—JAMES PINES, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] It is not error in the Court in a criminal case to require the defendant to say first whether he is ready for trial.

[2.] Under the act of 1856, a defendant has no right to ask the juror any other than the four questions prescribed by the act.

[3.] Whether subsequent confessions of themselves wholly unexceptionable, were made under previous influences still operating on the mind, is a question not of law for the Court but of fact for the the jury.

[4.] Where illegal expressions are admitted, which if believed would serve to mitigate rather than to establish the guilt of the prisoner, and the proof is full without them, it is no ground for granting a new trial.

Murder, in Webster Superior Court. Tried before Judge KIDDOO, October Term, 1856.

James Pines was indicted for the murder of his wife, Sa-

rah Ann Pines, alleged to have been committed on the 27th day of August, 1856.

The case being called, the presiding Judge required the prisoner to announce whether he was ready for trial, before calling on the State to announce, prisoner's counsel objected, and this constitutes the first ground of exception.

The prisoner and State both having announced "ready," and the jury being regularly empanneled, were put upon the prisoner, and when the second juror was called, he was put on his *voir dire*, and after answering the questions prescribed by act of 1856, the prisoner's counsel asked that the juror be put upon triors, and proposed to interrogate the juror himself, if he had formed and expressed any opinion in regard to the guilt or innocence of the prisoner, from rumor or hearsay, and if so, whether such opinion so formed and expressed, was fixed and decided. The Solicitor General, for the State, objected to the question; the Judge sustained the objection and refused to allow the jurors, when put on triors, to be asked any other questions than those prescribed by the statute; to which decision prisoner's counsel excepted.

The following is a brief of the evidence:

For the State.

*Mrs. Sarah Barentine*, sworn, testified that she saw prisoner on the 27th day of August, 1856, about 7 or 8 o'clock A. M., at her house; left about half past 11 o'clock A. M. Prisoner had on when he came there, a pair of blue pantaloons rather old, an old shirt with a rag tacked on one shoulder; a hole was worn in the shirt on the shoulder; and on the Monday before the 27th of August, prisoner told his wife at witness' house, to tack a rag over the hole. The next time she saw prisoner on the 27th, was a little after 3 o'clock P. M.; he did not have on the same clothes that he had on in the forenoon; she next saw the pants that the prisoner had on in the forenoon, on Thursday after the 27th, (to-wit, on the 28th,) at prisoner's house under the bed; did

not examine them then; saw them no more till the day of the committing for trial; they were the same pants that prisoner had on when he left her house in the forenoon of the 27th August; there was blood on the forepart of the pants when she saw them at Court. She saw the shirt again on Saturday of the same week; it was bloody on the forepart, right smart of blood on it, (shirt produced and shown to witness,) it is the same shirt; (pants shown to witness,) the same pants that prisoner had on the forenoon of the 27th August. Sarah Ann Pines, the deceased, was the wife of prisoner. In June previous, prisoner told her that he had struck deceased two or three licks with a hoe-handle. Came to witness' house when he told this; asked him then where his wife was; he replied, "the damned bitch has gone to the house to hunt her a place." All this occurred in this county, as witness believes. Saw no blood on the pants and shirt that prisoner wore in the forenoon of the 27th of August, the day of the killing.

*Cross Examined.*—Witness is mother of deceased. Prisoner lived with deceased after the difficulty in June, till her death. John Barentine, the prosecutor, is the son of witness.

*Dr. Jubilee Smith,* sworn, testifies that he is a physician; was called in, the 28th of August last, to examine deceased, Sarah A. Pines. She had one wound on the top of the head a little to the left side, two and a half inches in length and about two inches deep; another wound on the right temple seeming to have been done with a broad surfaced instrument; wound very much swollen; larger than witness' hand; seemed to yield to pressure, the skin was not broken. Another wound over the left eye brow seemed to have been done with an edged instrument, fracturing the skull. Another wound over the right eye brow, small depression, skin not broken; another wound on the right eye brow at the corner, appearance of an instrument having a corner, skin broken; is of opinion that the wounds produced the death of the deceased. The examination was at prisoner's house in Webster county.

Knows what a battling stick is; the wound on the right temple looked as though it might have been made with such an instrument. If the battling stick had been square, (as some of them are,) the wound on the top of the head might have been done with the corner of it; it cut very straight. Two of the wounds would have produced death; the one on the top of the head, and the one on the right temple; and the one over the left eye might probably have produced death.

*Cross Examined.*—The body of deceased was in prisoner's house when he saw it. A person falling in the well could not receive the wounds that were inflicted. Thinks the wounds could not have been inflicted by falling in the well, for the reason that the blood was on top inside of the curbing of the well, on the sides of it. Prisoner told him there was nothing in the bottom of the well that he knew of.

*Henry J. Askew,* sworn, testified that he was at prisoner's house on the 27th day of August last, in this county; saw the body of deceased that day in the well; helped to draw her out; she was dead; don't know who killed her. Prisoner has made confessions to him respecting the death of his wife; witness made neither threats nor promises to obtain the confessions, nor knew of none made by any one else. Prisoner commenced by asking him if they had found his shirt, and if they found it where he said it was; prisoner had said it was about two hundred yards from his house, west course, lying under a log, where two logs were lying cross-wise. Asked him why he did not carry his pants with the shirt? He replied, "if I had known they were bloody I would have done so;" and if he had known that it would have come out as it has, he would have told it all at the commencement; said that he was not satisfied till he told it, and since he told it, he felt much better. He showed witness (by placing his hands about,) where the shirt was bloody; he squatted down and took up the child in his right arm to avoid making it bloody; stated that he was fishing for the

bucket which was in the well; deceased came up and snatched the rope out of his hand and abused him, saying he did not know how to fish for it, and it made him mad; he picked up a battling stick and struck her on the head, on top, a little behind. The blood gushed out; she fell across the bucket-board; he ran round to keep her from falling in the well but could not do it without falling in himself, and was obliged to let her go; he caught her by the head and his shirt got bloody thereby; (shirt shown to witness,) it is the same shirt that was found when witness and others were hunting for it. The shirt was found from information given by prisoner of its whereabouts. Deceased was pregnant, when witness took her out of the well.

*Cross Examined.*—During the time that deceased was being taken out of the well, prisoner was in the house; prisoner came running to my house about a half a mile and hollowing; I answered him, and he then made a worse alarm than he was making, crying to me to run there for the Lord's sake; that his wife was in the well. It shocked me; in a few moments I cut out to meet him and ran across the woods and jumped in the road ahead of him, and said to him, "now Pines don't take on, but tell me all about it;" he said he came to the house and his child had hold of the curb, screaming and hollowing; he ran to the well, looked in, saw some part of her dress and may be one foot; he picked his child up and ran to the old lady and told her about it; she told him to run and tell him (witness,) of it and ask him if he pleased to send the boys and help get her out. I asked prisoner what he would have me to do; he made no reply; I said "go and let the folks know it;" he said "if you please." I went to the school house and had school dismissed for the children to go off and let it be known. I then went on to get deceased out of the well. This was Wednesday, the 27th day of August, and the confession made by prisoner was on Monday, the 1st September.

*Re-examined.*—when prisoner came running to me there was no blood on his clothes.

Here the testimony for the State closed.

Evidence for the prisoner.

*Dr. B. O. Hattox* sworn, testified that prisoner made confessions to him the day after he was put in jail. He, Dr. Hawkins, Charles T. King and Jesse Harrell, Jr., were together at the jail; does not recollect now who else was present; had previously asked prisoner who he suspicioned of committing the murder, and asked him now again. Prisoner said he did not know who to suspicion. Witness suspicioned prisoner of being guilty and said to him, it would be better for him to come out and tell the truth about it; that by telling the truth about it he might probably save his neck, or words to that effect. Mr. King told him the circumstances that he knew or had heard of, about a man who had once killed a woman with a battling stick in the heat of passion, and concealed the body in an old well or some such place, and it cost the man a hundred or two dollars, but he come off clear; the man confessed the killing by accident. This seemed to affect the prisoner, who asked some questions about the man. Dr. Hawkins said something to prisoner respecting his confessions; that it might be better for him to do so. The conversation among us in the presence of the prisoner, was about to this effect: that as the matter then stood, he would have to be tried for murder, and if found guilty he would have to be hung, but if found guilty of manslaughter, he would not have to hang; don't recollect telling prisoner that if he would confess it would be reduced to manslaughter; tried to obtain confessions by asking various questions as to how he had lived with his wife, and other questions to entrap him into a confession. Prisoner then asked the balance of the crowd to retire, that he wanted some private conversation with witness. As Dr. Hawkins left, he said to prisoner to tell the truth; that what-

ever he told let it be the truth.    After the crowd retired, prisoner said he was the man that done it; that the fuss between him and his wife commenced in the house; he cursed her and she cursed him; she kept abusing him till they got out of the house; did not say that any blows passed in the house nor out of it, till they got to the well; when he got to the well the bucket had got broken off of the rope and he was leaning over the well endeavoring to dislodge it; while leaning over the well, his wife came up and jerked the rope out of his hand and cursed him and said something that made him very mad; he stepped back a few steps and picked up the battling stick and struck her on the head much harder than he thought he did, and immediately discovered that he had killed her; he ran round and gathered her in his arms, and while holding her up he discovered the blood, and it weakened him so that he had to let her fall in the well, that was when and how he got the blood on his shirt. Said when he struck her she was leaning over the well and fell across the curb, and when he ran round to catch her, she was in the act of falling into the well; she had on her bonnet, and did not see him when struck; said he then picked up the child and ran in the house and set it down by the side of the half of a water mellon, and ran off about two hundred yards from the house and hid his shirt under a log; came back, gathered up the child and ran over to his mother-in-law's, Mrs. Barentines, and gave the alarm.

*Cross Examined.*—Told prisoner that it would be best for him to confess, and explained to him what witness thought was the difference between murder and manslaughter; told prisoner if he would tell him the truth about it, he should have counsel, and that he would advise him what would be best for him.   Prisoner said that in his condition, if he ever needed a friend he needed one then; that he looked upon witness as his friend, and if witness thought it best for him to come out and tell the truth about it he would do so; said he struck deceased one lick on the back of the head.

*Re-examined.*—When he went to the jail to see prisoner, he thought he had no more sense than to tell it to him, if he could get him to himself, and determined to get him to confess by any reasonable means that he could use. Is a practicing physician; is acquainted with Dunglison's works or Enclydopedia; persons affected with homicidal melancholy are liable to inflict injury or death on any person, even their best friends, and yet be capable of transacting ordinary business.

In reply the State introduced

*Dr. L. B. Hawkins,* who testified that he is recognized as a practicing physician; does not think that the prisoner is is afflicted with homicidal melancholy—the symptoms of the disease are to destroy.

After the testimony on both sides was closed, prisoner's counsel moved to exclude and withdraw from the consideration of the jury all the testimony in relation to prisoner's confessions, on the ground that said confessions were not freely and voluntarily made, having been drawn out under promises of favors made to prisoner by Dr. Hattox and others, and by misrepresentations of the consequences of such confessions, and the promises of assistance and protection held out to him.

The Judge overruled the motion and allowed the confessions to go in evidence to the jury. To which decision prisoner by his counsel excepted.

The presiding Judge charged the jury, (after a preliminary explanation of the definitions of the crimes of murder and manslaughter and of malice expressed and implied,) that if they were convinced beyond a reasonable doubt that the prisoner was guilty of homicide, it would be their duty to determine, from the evidence, whether it was murder or manslaughter. If they believed the killing was done without malice either expressive or implied, and without any mixture of deliberation, then the crime was manslaughter; if done with malice aforethought, it was murder. That if

they had any doubt, the prisoner was entitled to the benefit of that doubt.   That malice need not have been harbored for a year, a month, a day, or an hour; but if the prisoner entertained malice for a moment of time, and if actuated by that malice, he did deliberately perpetrate the deed, it was murder.

The jury retired and returned a verdict of guilty.

Prisoner's counsel tendered his bill of exceptions and assigns for error.

1st. That the Court erred in deciding that when said case was called the prisoner should first announce whether he was ready for trial.

2d. That the Court erred in not allowing prisoner's counsel to ask the juror when put upon triors whether he had formed and expressed any opinion in regard to the guilt or innocence of the prisoner from rumor and hearsay, and if so, whether it was an opinion fixed and decided.   And that the Court erred in holding that no other questions could be asked the juror, when upon triors, than those prescribed by the act of 1856.

3d. That the Court erred in admitting in evidence the confessions of the prisoner.

HARRISON & COX; by LANIER; and B. S. WORRELL, for plaintiff in error.

Sol. Gen. HARRELL; and JOHN A. TUCKER, for State.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The first question made by the record in this case is, was the Court right in permitting the Solicitor General to call upon the defendant to announce first if he was ready for trial.

A contrariety of practice has obtained and still exists in the State upon this subject, and even in the same circuit the practice has not been uniform, and this has resulted from

the fact that there is no law upon the point. In England the crown was never forced to announce itself ready. No such doctrine has ever prevailed here.

By the penal code, the cause stands for trial at the term when the indictment is found. It may be continued, however, as long as the principles of justice may require. This settles nothing as to the question who shall go forward.— Neither does the provision in the code which entitles a defendant to make his demand and force a trial at the second term. Besides, this provision does not apply to capital cases. My own opinion is, that from all the analogies of the law, the State, who holds the affirmative and is the *reus* or actor, should announce first. Still I do not find any authority for pronouncing a judgment to the contrary erroneous. Nor do I believe any can be found on the other side. There is no statute upon the subject; neither is there any common law rule which is obligatory upon the Courts of this State. My position is, therefore, one of neutrality, acquiesing in whatever practice each circuit may establish for itself until the Legislature see fit to intervene, should it deem the matter of sufficient importance to regulate by law.

Even if I thought the Circuit Court erred in the decision, I would not reverse the judgement, because both parties were ready, and consequently the ruling worked no injury to the defendant, and there was no motion for a new trial.

[2.] Was it right to disallow any other questions being asked the second juror put upon the prisoner than the four propounded by the act of 1856 ?

The act declares that if the juror answer the four questions therein prescribed in the negative, he shall be held and adjudged a competent juror in capital cases. *Provided*, nevertheless, that either the State or the defendant shall have the right to introduce evidence before the Judge to show that any of the answers of the juror are untrue ; and it shall be the duty of the Judge to determine upon the truth of such an-

Pines vs. The State.

swer as may be thus questioned before the Court.   [*See Acts*
*1855–1856, p. 231.*]

It is true that the further statements of the juror himself
might be called "evidence," in the language of the statute.
But why limit the questions to four if twenty may be asked?
And then the words of the act are, "shall have the right to
*introduce evidence,*" rather intimating that the proof is to
come from some other source than the juror himself. We
would not say that the Court might not *sua sponte* further
interrogate the juror. We only intend to negative the right
of the party to do this.

[3.] Was the Court right in refusing to withdraw from the
jury all the proof of confessions ?

The confessions of the prisoner as testified to by Dr. Askew,
on Monday, subsequent to the homicide, were *per se,* wholly
unexceptionable. It seems, however, that several days pre-
viously, confessions had been made by the prisoner to Dr.
Hattox, and these were submitted to the jury in rebuttal by
the prisoner himself. What right had he to withdraw them ?
Had he not by their introduction endorsed their truth ? At
any rate, whether the hope of reward held out to the defen-
dant the preceeding week had continued to operate on his
mind the next Monday, was a question not of law but of fact
for the jury.

After all, what do these confessions amount to ?   Did they
weigh a feather with the jury ?  A more brutal murder was
never perpetrated.   A helpless and dependent wife in a state
of pregnancy, felled to the earth by the repeated blows from
a bludgeon by her ruthless and inhuman husband, and then
tossed like a stone in the well, that he might feign that she
had drowned herself, and the proof was full and ample with-
out these confessions.   They were but a bungling attempt to
trump up something to mitigate the horrible deed, which the
defendant had committed.   The jury did not believe them,
and they would have availed nothing if they had.

Judgment affirmed.