## Woolfolk *v.* The State.

85   69
110  245

85   69
114  447

85   69
122  340

1. The defendant's father and step-mother having been killed on the same occasion, and the defendant being on trial for the killing of the former, disqualification of the trial judge did not result from

his having been consulted as counsel, after the homicide and before he became judge, by a brother of the step-mother, as to the distribution of her estate ; knowledge or want of knowledge of the person who did the killing not affecting the distribution, and it appearing that nothing was said between them as to who this person was, and that the judge, while a practicing attorney, had merely informed his client as to the law of distribution and advised him to take out letters of administration.

2. Upon a motion to change the venue on the ground that an impartial jury could not be obtained in the county, and an offer to introduce evidence to this effect, the judge properly overruled the motion and held that he had no power to hear such evidence, and that the venue could be changed only by an examination of the persons liable to serve as jurors, as prescribed in section 4687 of the code.

(*a*) This section of the code is not unconstitutional as impairing the right of the defendant to be tried by an impartial jury. Nor is the statute unconstitutional because the power which the constitution has vested in the judge to change the venue where he is satisfied that an impartial jury cannot be obtained in the county, is restricted by said statute, the constitution further providing that this power shall be exercised " in such manner as has been or shall be provided by law. "

3. With the means afforded by law for obtaining impartial jurors, public excitement alone is not a sufficient ground for continuance, especially where nearly two years have elapsed since the commission of the crime.

4. Compulsory process of the court to procure the attendance of a witness residing beyond the State, would have been nugatory, and was properly refused ; and there was no abuse of discretion by the trial judge in refusing a continuance on account of the absence of such witness  Although the defendant stated that he expected to procure the attendance of the witness at the next term of the court, it did not appear that the witness had promised to attend or that there was any other ground for this expectation.

5. A challenge to the array was made under the following circumstances : A term of the court which had been ordered for the purpose of trying the defendant, began on Monday, and the jurors drawn for the term were then empanelled and put upon the defendant. A jury was partly selected, and the remaining jurors who had been drawn and empanelled but not selected, were discharged for the term.  On Wednesday of the same week a mistrial was declared.  The court being then without jurors, except talesmen who had been summoned to attend but had not been put upon the defendant, the judge drew from the jury-boxes the names of the proper number of jurors and directed the sheriff to summon them to attend on the following day, when the defendant would

be again put on trial; and the talesmen then in attendance were ordered by the court to return at the same time. The jurors thus drawn and the talesmen appeared accordingly on the following day, and twenty-four of the jurors drawn were empanelled as the two regular panels of petit jurors for the court, and these, together with twenty-four of the talesmen, were empanelled and constituted the array first put upon the defendant for the trial now under review. One of the grounds of challenge was that the judge had no power to draw these jurors at the time he did, and that the defendant, when again placed on trial, was entitled to have first put upon him the jurors who had been drawn before the organization of the court on Monday and had been empanelled on that day. *Held*, that the court did not err in overruling the challenge on this ground, the code (§3942) providing substantially for the emergency.

6. Nor did the court err in overruling the challenge on the ground that talesmen summoned prior to the mistrial and who had not been put upon the prisoner, were ordered to return after the mistrial, and constituted a part of the array.

7. Nor was it proper ground of challenge that the court, when additional talesmen were needed, drew the names of some of them from the grand jury-box, the code (§3935), under which these talesmen were drawn, not restricting the judge to either one of the boxes exclusively, its language being "the jury-boxes of the county."

8. Requests to charge which were lengthy and argumentative and the material propositions in which were substantially covered in the charge given by the court, were properly refused.

9. The statute (Code, §4682) which prescribes the questions to be asked the juror upon his *voir dire* and declares that when answered as therein prescribed he shall be adjudged a competent juror, does not impair the constitutional right of the defendant to be tried by an impartial jury. The legislature has power to prescribe the manner in which the qualifications of jurors shall be tested, and the manner prescribed in the statute for interrogating the juror and for contesting by evidence the truth of his answers, affords ample test of his impartiality

(*a*) Where jurors on their *voir dire* had answered the statutory questions so as to qualify themselves, and it not appearing from their answers that they misunderstood the questions, the court did not err in refusing to ask or to allow counsel for the defendant to ask other questions of the jurors to ascertain whether they understood the meaning of the words "bias" and "prejudice," and what they meant when they answered that they were perfectly impartial between the State and the accused, and whether they had not entertained and did not then entertain a settled and fixed opinion that the defendant was guilty.

(b) It is the duty of the judge, when it appears to him from the juror's answer that the latter does not understand the statutory questions, to explain them, it being left to his discretion to vary the form of the questions.

10. It is within the discretion of the court to explain to the jurors, before they have answered the statutory questions on their *voir dire*, the meaning of the words "bias" and "prejudice" and "perfectly impartial," as used therein; yet if he should fail to do so, it would not be error.

11. The testimony of witnesses that certain marks and spots were the print of a hand and blood-stains, was not incompetent because their information was acquired from an inspection which they made while jurors on a former trial of the case.

12. Testimony that the defendant while alone in his cell was over-heard to say, "Lord, have mercy upon me for what I have done; the only thing I regret is killing my father," was not incompetent because the witness was the jailer in charge of the defendant, the law not disqualifying a jailer from testifying as to voluntary acts and confessions of prisoners under his charge.

(a) That the defendant on the same occasion may have said something else in connection with this which the witness did not hear, did not render it inadmissible, the latter testifying that nothing else was said within his hearing, and it not appearing from the evidence that anything else was said.

(b) It is not against public policy to allow a prayer which inculpates the person who made it, to be given in evidence against him.

13. Testimony as to prayers in which the defendant declared his innocence of the crime, although offered in reply to evidence as to an inculpatory prayer, was properly rejected, the rule being to admit inculpatory declarations or confessions, and to exclude those which are exculpatory, when disconnected therewith.

14. The admission, over the defendant's objection, of testimony that the defendant, after the homicide, on being asked, "Who will get the property?" (meaning the property of the deceased), replied, "It is not worth while to mention that; my sisters will get the property; when the proper time comes I will settle that question," although the testimony was irrelevant, was not such error as would require the grant of a new trial.

15. Testimony by a witness that he was informed by another that the latter had heard a third person give a minute account of the killing—the defendant proposing to prove this (1) with the statement repeated, and (2) without any repetition of it,—and that the informant of the witness had become frightened and denied making the statement, was incompetent.

16. A witness having testified that on the night of the killing and about the time it occurred, while she was at a house near the scene of the killing, a barefooted negro whom she did not recognize and

did not undertake to identify, came to the house and conversed in low tones with a third person who lived there, the defendant, for the purpose of identifying this unknown negro, offered to prove by others that a certain insane negro then present in court was seen barefooted, three days after the killing, eleven miles from the place where it occurred, and that when arrested afterwards in a distant part of the State charged with being an escaped convict, he said that he was "on the Woolfolk place the night the nine were killed," and mentioned the name of the person with whom the unknown negro was said to have conversed that night, and said that a woman named "Ann" (that being the Christian name of a woman who lived on the premises) gave him his breakfast: *Held*, that in the absence of other evidence to identify the negro in court as the unknown negro first mentioned, and of other evidence to connect him with the crime, the testimony offered for this purpose was irrelevant.

17. Sayings of the defendant prior to the killing indicating animosity towards his step-mother, to wit, that she was " the meanest woman in the world, the damnedest, meanest woman in the world," and that he hated her, were not inadmissible on the ground that he was then on trial for the homicide of his father and not of his step-mother.   Both having been killed at the same time, a motive which may have led to the killing of the one may have been connected with the killing of the other.

18. Admissions of a third party, and his acts and declarations some time after the killing manifesting excitement and a desire to get away when interrogated on that subject, and his contradictory state. ments as to where he was on the night of the killing, in the absence of other evidence connecting him with the crime, were inadmissible. Nor would threats of such third party prior to the killing, against the family killed, be received in connection with such conduct and statements, to render the whole admissible as evidence for the defendant.

19. Where a witness, on a very protracted and minute cross-examination by counsel for the defendant, was interrogated and had answered as to whether he was crazy and had done certain acts tend· ing to show that he was crazy, the purpose being to discredit his testimony·by proof that he was crazy, the refusal of the court to allow a still more extended cross-examination on the same line, if error at all, was not such error as to require the grant of a new trial, especially as the defendant was permitted to introduce other testimony for the same purpose, and covering most of the same matter.

20. Certain socks being offered in evidence, which a witness testified were found in a well on the premises where the killing occurred, it was not error to admit them in evidence over the defendant's objection that the testimony of the witness did not sufficiently identify them

as the same which had been found in the well, this being a question for the jury.

21. Apprehensions by the deceased of harm from third persons not connected by other evidence with the crime, were irrelevant.

22. Two juries having found the defendant guilty, and the trial judge being satisfied with their finding, and there being sufficient evidence to uphold the verdict, this court does not feel authorized to disturb it.

July 28, 1890.

Murder. Criminal law. Trials. Practice. Judge. Venue. Jury and Jurors. Statutes. Constitutional law. Continuance. Witness. Charge of court. Evidence. Confessions. Verdict. Before Judge Gustin. Houston superior court. April adjourned term, 1889.

Reported in the decision.

BACON & RUTHERFORD, C. C. DUNCAN and W. M. WIMBERLY, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, W. H. FELTON, Jr., solicitor-general, and HARDEMAN & NOTTINGHAM, for the State.

SIMMONS, Justice.

Woolfolk was indicted and tried in the superior court of Bibb county for the murder of his father, and was convicted. There were eight other indictments against him for the killing, at the same time and place, of his step-mother, six brothers and sisters, and Mrs. West. He made a motion for a new trial, which was overruled in the court below, and he brought the case to this court; and a new trial was granted. 81 *Ga*. 551. When the case was again called in Bibb superior court, the venue was changed to Houston county, because of inability to obtain a jury in Bibb. On the trial in Houston he was again convicted. He again made a motion for a new trial, which was overruled, and the case was for the second time brought to this court.

1. It appears from the record that when the case was called for trial in Houston county, Woolfolk objected

to being tried by Judge Gustin, claiming that the judge was disqualified to try him because of the fact that the firm of Gustin & Hall, of which the judge was a member before his election to the bench, had been consulted by C. W. Howard, a brother of Mrs. Woolfolk, as to the distribution of her estate. The facts set out in the record show that after the killing of the Woolfolk family, Howard did consult Gustin & Hall, and was advised by them that the distribution of the property would depend upon whether Mrs. Woolfolk survived her children, or whether one or more of them survived her, and he was further advised by them to take out letters of administration upon her estate. Nothing further was done by the firm in this matter, Judge Gustin having been elected to the bench shortly thereafter. The question presented by Howard involved no inquiry into the issue as to the person who did the killing, and no such question was considered or advised upon. Subsequently to Judge Gustin's election to the bench, Hall, the other member of the firm, was employed to assist in the prosecution of Woolfolk.

Upon this state of facts, the judge decided that he was not disqualified to try the case. Woolfolk excepted, filing his exceptions *pendente lite*, and also alleging the same as error in the second ground of his amended motion for a new trial. There was no error in this ruling. The code, §205, prescribes the grounds of disqualification of a judge. These grounds are pecuniary interest in the cause, relationship to either party within the fourth degree of consanguinity or affinity, his having been of counsel therein, or having presided in an inferior judicature when his ruling or decision is the subject of review. The facts above recited show that Judge Gustin was not of counsel in this case; and his being retained or employed to advise as to the distribution of Mrs. Woolfolk's estate, in no way connected

him with the prosecution of the person charged with her killing. The distribution of her estate did not depend upon who killed her, but whether she died before or after her husband and her children. The knowledge or want of knowledge of the person who killed her and her husband and children, could not affect the distribution. In the one case the question would be, which died last; in the other, who did the killing. It was unnecessary, therefore, for the judge to have consulted with his client as to the person who did the killing, and he certifies that nothing was said between them upon this subject. He could therefore have obtained no information from his client as to the perpetrator of the crime.

2. When the foregoing objection was overruled, the defendant made a motion to change the venue from Houston county, upon the ground that an impartial jury could not be obtained in that county; and upon the ground that he could not safely go to trial in that county, because his life would be in danger and his person at all times liable to violence. The motion goes on to give a full history of the case from the time of the homicide, alleging great public excitement occasioned by the atrocity of the crime and by newspaper comments, and alleging that the jurors of the county had fixed opinions as to the defendant's guilt, and as to this he offered to introduce evidence to the court. The motion was overruled, and the 1st ground of the amended motion for a new trial alleges that the court erred in overruling the motion to change the venue, and in refusing to allow the defendant to introduce testimony to sustain the allegations set forth therein, and in holding that the court had no authority under the law to hear evidence on the motion to change the venue, and that the venue could be changed only in accordance with section 4687 of the code; and also in

holding that said section was not in violation of the constitution of the State of, Georgia or of the constitution of the United States.

Before the venue in a criminal case can be changed, the presiding judge must be satisfied that an impartial jury cannot be obtained in the county. Constitution, art. 6, sec. 16, par. 6, Code, §5172. See also §4686. Section 4687 declares that he shall be satisfied of this "only by an examination, careful and thorough, of the persons liable to serve on juries, such examination to be according to section 4682 of this code, partially or wholly, according to the nature of the case." Section 4682 requires that in all cases of felony the following questions shall be propounded to the juror: "Have you, from having seen the crime committed, or having heard any of the testimony delivered on oath, formed and expressed any opinion in regard to the guilt or innocence of the prisoner at the bar?" If the juror shall answer in the negative, then the following question shall be propounded to him: "Have you any bias or prejudice resting on your mind either for or against the prisoner at the bar?" And if the juror shall answer these questions in the negative, the following question shall be propounded: "Is your mind perfectly impartial between the State and the accused?" And if he shall answer this question in the affirmative, he shall be adjudged and held a competent juror, in all cases where the offence does not involve the life of the accused; but when it does involve the life of the accused, the following additional question shall be put to him: "Are you conscientiously opposed to capital punishment?" If he shall answer this question in the negative, he shall be held a competent juror: Provided, nevertheless, that either the State or the defendant shall have the right to introduce evidence before the judge to show that the answers, or any of them, of the jurors

are untrue; and it shall be the duty of the judge to determine upon the truth of such answers as may be thus questioned before the court.

The trial judge denied the motion of the defendants to hear *aliunde* evidence as to the formation and expression of opinion by the jurors, and held that he had no power or discretion to hear any evidence except the answers of the jurors themselves to the foregoing questions. If there had been no statute prescribing the manner in which the presiding judge should satisfy himself that an impartial jury could not be obtained in the county, we would nevertheless hold that the judge did not err in the method pursued in this case. In the case of *Hunter* v. *The State*, 43 *Ga.* 483, which was tried before the adoption of the statute (§4687 *supra;* Acts 1871–2, p. 49), when the law was silent as to the manner in which the judge should satisfy himself of this fact, this court approved of this method. Judge Alexander, the trial judge in that case, in order to de.ermine whether the defendant could obtain a fair and impartial jury in the county, had the foregoing questions propounded to the jurors, holding that he ought not to change the venue unless after trying to get a jury it should appear that an impartial jury could not be had in Brooks county. This court, in reviewing the case, held: "The provisions of the constitution clothe the superior court with power to change the venue when the presiding judge is satisfied an impartial jury cannot be obtained in the county, and while the judge may in his judgment become satisfied by *aliunde* evidence, still we hold that the most satisfactory method of arriving at such conclusion, as well as that most within the contemplation of the provision of the constitution, is to test the question by trying to get a jury in the county where the crime was committed." And it seems to us that it is the most satis-

factory way of determining whether a fair and impartial jury can be obtained. Any other evidence introduced before the judge would be mere opinion of the witness, or hearsay. Under the method prescribed by the statute, every juror in the county can be brought before the court, and fully examined as to his impartiality between the State and the accused.

It is argued by the able and indefatigable counsel for the plaintiff in error that this statute is unconstitutional, because it prescribes but one mode in which the judge shall satisfy himself as to whether an impartial jury can be obtained; that the constitution leaves the mode and method of determining this question to the judge himself, and that the legislature, therefore, had no right to prescribe that he should only be satisfied by an examination of the jurors upon their *voir dire* as prescribed in section 4682. In reply to this argument, it is only necessary, in our opinion, to quote, in connection with the clause of the constitution already cited (§5172), the provision which immediately follows it (§5173), which is as follows: " The power to change the venue in civil and criminal cases shall be vested in the superior courts, to be exercised in such manner as has been or shall be provided by law." The act had been passed by the legislature and embodied in the code, and was of force when the constitutional convention met in 1877 ; and with full knowledge of this, the convention adopted the foregoing paragraphs of the constitution. When they declared that the power to change the venue should be exercised by the superior courts "to be exercised in such manner as *has been or shall be provided by law*," the convention must have had in mind the act of December 13th, 1871 (§4687 *supra*), prescribing the manner in which that power should be exercised. The convention ratified the act, and gave the legislature authority to alter or change it, or adopt another method if it should see proper to do so. See *Brinkley* v. *State*, 54 *Ga.* 371 ;

*Blackman* v. *State*, 80 *Ga.* 785, where this court held that the act was constitutional. '

As to its being in violation of the constitution of the United States, we will discuss that in another part of this opinion, wherein we deal with the right of the defendant to propound to jurors other questions than those prescribed by the statute. We hold that the court did not err in refusing to allow the defendant to introduce testimony to sustain the allegations in his motion to change the venue, nor in holding that the court had no authority to hear any evidence on the motion to change the venue, and that the venue could be changed only in accordance with section 4687 of the code.

3. The motion to change the venue having been overruled by the court, the defendant then made a motion to continue the case, upon the ground of public excitement, as set out in his motion to change the venue, and upon the further ground of the absence of York, by whom the defendant expected to prove " that there was no print of a bloody hand upon the drawers that were said to have been drawn out of the well on the Woolfolk plantation on the evening after the killing; and that after the witness Hollis had undertaken to point out said print of a bloody hand, he could not swear positively that it was a print, nor could he swear that there was any blood at the place pointed out by the said Hollis." Defendant proposed to prove this in addition to what the said York testified to on the former trial. He alleged that a *subpœna* had been issued for York, at his instance, and that he had placed it in the hands of the sheriff, and that it was not until March 1st, 1889, that the officer reported that York had removed to the State of Texas. The defendant alleged that in April thereafter, he applied to the court for compulsory process to compel the attendance of this witness, and that

the court refused to issue the same or make any effort to have him present; and he again asked the court for compulsory process to compel the attendance of the witness, and that the case be continued until the defendant could have the benefit of such process; that the motion was not made for delay, and that he expected to have the witness present at the next term, if compulsory process were granted.

There was no error in refusing to continue the case upon the ground of public excitement. The record shows that the crime was committed on August 6th, 1887. The defendant was tried first at the May term, 1888, and a new trial was granted by this court in February, 1889, and he was again placed on trial in June, 1889. Nearly two years, therefore, had elapsed from the commission of the crime, nearly one year from his former trial, and about four months from the granting of a new trial by this court, before he was again placed on trial. So it seems that if there had been public excitement against the accused, there was sufficient time for it to have cooled before this trial. But whether this be true or not, this court had held, in a number of cases, that since the passage of the act requiring jurors to be put upon their *voir dire* and to answer the questions set out in section 4682 of the code, *supra*, public excitement alone is not a sufficient ground for continuance. This was held in *Thompson* v. *State*, 24 *Ga.* 297, in which case McDONALD, J., in delivering the opinion of the court, says: "Prior to the act of 1856 in relation to the qualification of jurors to serve on the trial of persons charged with felonies, this court had inclined to listen favorably to applications of this sort. Since that time, it is impossible that a party on his trial for such an offence, if he choose to avail himself of all his legal rights, can have an unfair trial, unless it be by the perjury of persons put upon him as

jurors, or the palpable misconduct of the officers of the law." In the case of *Lovett* v. *State*, 60 *Ga.* 257, it was held that "with the means afforded by law for obtaining impartial jurors, and for changing the venue if necessary, the continuance of a criminal case on the ground of popular excitement is not essential to a fair trial; especially after the lapse of more than three months from the commission of the homicide." In the case of *Cox* v. *State*, 64 *Ga.* 403, it is said: "With regard to public excitement and prejudice, we see nothing to take this case out of the general rule long since laid down here authoritatively, to the effect that these have ceased to be cause for a continuance." To the same effect see *Brinkley* v. *State*, 54 *Ga.* 371, *Johnson* v. *State*, 48 *Ga.* 116, and *Maddox* v. *State*, 32 *Ga.* 582.

4. Nor did the court abuse its discretion in overruling the motion for continuance on the ground of the absence of York. He had removed from this State to the State of Texas, and we know of no law authorizing the judge of the superior court to issue compulsory process to compel the attendance of a non-resident witness. The power of the court to compel the attendance of witnesses does not extend beyond the limits of this State. If the court had issued a compulsory process to compel the attendance of York, it would have been nugatory in the State of Texas; York could have disobeyed it with impunity; no officer of this State could have executed it in Texas, nor, so far as we know, would any officer in that State have been authorized to execute the process. The defendant did not bring himself within the rule laid down by this court in *Brown* v. *State*, 65 *Ga.* 332. In that case the defendant moved to continue on account of the absence of two witnesses who resided in the State of Alabama, and showed to the court by proper testimony that these witnesses had stated to his brother that they would come to court and

testify as stated in the affidavit of the defendant, whenever requested or notified to attend. The trial judge refused a continuance, on the ground that he had no discretion in the matter, because the witnesses resided beyond the limits of the State. This court reversed that ruling, upon the ground that the court below did have a discretion, and ought to have exercised it when shown that although the witnesses resided out of the State, they had promised to attend the court when requested to do so. While the defendant in the present case said in his motion that he expected to have York in attendance at the next term, if the case were continued, he did not state, as in the *Brown* case, that the witness had promised to come when requested, or how he expected to procure his attendance. The court being powerless to force York to attend, the motion should have gone further and stated the means whereby the defendant expected to procure his attendance.

. 5. The motion for a continuance having been overruled, the trial was ordered on, and an array of forty-eight jurors was put upon the defendant; whereupon he challenged the array on the following ground: "The said array is illegal because not made up and formed according to law. This being the first array placed upon him since the commencement of the trial, should be composed of the regular panel of twenty-four traverse or petit jurors, and twenty-four tales jurors, summoned or drawn according to law for this trial; and defendant says that this array is not composed of said regular panel of twenty-four traverse or petit jurors, as will appear by a comparison of the list now furnished this defendant and the list now on the minutes of the regular panel of twenty-four traverse jurors who were regularly empanelled and sworn as such upon the opening and organization of this court on Monday of this week, and which said panel has been discharged; nor is it

composed of tales jurors summoned or drawn for the
trial now pending." The facts appear to be that the
court was organized on Monday, June 3d, 1889, for the
purpose of trying the defendant, and that twenty-four
jurors had been regularly drawn and empanelled upon
Monday morning. The trial proceeded, and on Wednes-
day, June 5th, for some reason not shown by the rec-
ord, a mistrial was declared. The jurors who had been
rejected when the first jury was being obtained, had
been discharged by the court. We infer from the brief
of counsel for the plaintiff in error that some of the
original panel had been taken upon the first jury.
When the mistrial was declared, these also were dis-
charged. The court, being then without a jury, drew
the proper number from the jury-box and ordered them
summoned for the next morning, and directed the tales-
men who had been summoned for examination when
the first jury was selected, to appear also the next
morning. The jury thus drawn appeared in obedience
to the summons, and were empanelled as the petit jury.
The twenty-four drawn from the box and twenty-four
of the talesmen who had been ordered to return, were
placed together on the list, and constituted the array
first put upon the prisoner, and which he challenged as
illegal. He contended that the array was illegal be-
cause, under section 3935 of the code, he was entitled
to have first put upon him the twenty-four jurors em-
panelled at the organization of the court on Monday
morning, and that as they had been discharged,
the court had no authority to draw from the box or
summon and empanel a second jury in their place. He
contended further that the court had no authority to
order the talesmen who had been summoned to attend
when the first jury was selected, and thereafter dis-
charged, to return the next day as talesmen for this
trial. Five other arrays were put upon the defendant,

and each was in turn challenged upon the same ground; the additional ground being taken in the third and succeeding challenges, that the court erred in drawing talesmen from the grand jury-box as well as the petit jury-box, it being contended that the judge had no power or authority to draw from both boxes at the same time. The various challenges were overruled, and this is assigned as error in the 4th ground of the original motion for a new trial.

The power of the judge, under the circumstances above stated, to draw a jury and have the jurors summoned and put upon the defendant, is the only question made by the defendant upon this branch of the case. If the judge had the power to draw this jury, he was right in overruling the challenges; if he did not have the power, he should have sustained them. The several sections of the code which regulate the drawing of juries, provide for the drawing of a jury in almost every conceivable case where one is needed; and the general tenor of the code is to give power and authority to the judge of the superior court to draw and summon juries whenever the business of the court requires it. We think that, under section 3942 of the code, the trial judge, under the peculiar facts of this case, had power and authority to draw the jury as he did. That section is as follows: "Whenever the session of any court of record in this State shall be prolonged beyond the week or period for which juries were drawn at the close of the preceding term, as by law provided, or the judge anticipates that the same is about to be so prolonged, or from any other cause such court has convened or is about to convene, and there have been no juries drawn for the same, it shall and may be lawful for such judge to draw juries, so many as may be necessary for such court, and cause them to be summoned accordingly, in the manner pre-

scribed for drawing juries at the close of the regular terms of such courts respectively." Here was a court which had met for the express purpose of trying the defendant. The juries were properly organized at the commencement of the court. For some reason, which the judge doubtless deemed sufficient, these jurors had been discharged and a mistrial had been declared. The above section provides that if the session of the court shall be prolonged beyond the week "*or period for which juries were drawn, or the judge anticipates that the same is about to be so prolonged*," it shall be lawful for him to draw juries and cause them to be summoned. The original panel was drawn for the trial of this case. On Wednesday a mistrial was declared, and the discharge of the jury completed. The fact that the jurors were all discharged, shows that they were drawn for that trial alone, and that the court had convened for that trial only, at least so far as jury service was concerned, because otherwise the juries would have been retained. After the mistrial, a new period for the sitting of the court was entered upon, to wit, the period of a second trial, which was not anticipated when the court convened. To have such second trial at that same term, it was necessary to prolong the court beyond the period for which the discharged jurors had been drawn, that period having terminated when the first trial resulted in a mistrial. It is not doubted or disputed that if the judge had adjourned his court for a month or a week the day this mistrial was declared, he would have had the power and authority to draw a jury for the adjourned term thereof; if he had adjourned until the following Monday, no one would doubt that he had the authority, under this section, to draw a jury to meet him on that day. If he has the power and authority to open the box and draw a jury under such circumstances, would the giving of his order to the

sheriff to summon them for the next morning make the jury illegal? It will be observed that this section of the code does not prescribe for what particular day, or how long in advance, the jury shall be summoned; and it does not appear that any objection was raised to the fact that the jury were summoned for the next day; the objection was that the judge had no power to draw the jury when he did. As the only objection made was want of power to draw the jury, we think there was no error in overruling the defendant's challenges to the array.

Counsel for the plaintiff in error argued that when a mistrial was declared and the judge had discharged the original panel of jurors, the court was at an end so far as the trial of cases was concerned. Admitting this to be true for the sake of the argument, it will not be denied that the judge still had the power to convene court at some future time for the purpose of trying the defendant. If he had the power to convene the court for that purpose, he certainly, under this section of the code and under the general law, had the power to draw a jury for that court. Under the law, the judge of the superior court has power to hold an adjourned term or call a special session for the purpose of trying criminal cases. The law does not designate what month, week or day he shall appoint for this purpose; nor is there any law requiring any number of days to intervene between the special or adjourned term, and the term which precedes it. If the regular term expires on Saturday, and the judge has no court to hold elsewhere in the circuit on the following week, and the business of the court he is holding is not finished, he certainly has the right to hold an adjourned term the following week. If this be true, what was there to prevent the judge in this case, when the court was at an end by reason of the juries having been discharged on Wednesday, from or-

dering an adjourned term to begin on the following
day ? If he had the power to hold an adjourned term
on Monday of the following week, why could he not
order the adjourned term for the next day? We know of
no law which would prevent it. The court having the
power, therefore, to convene on the following day, and
being about to convene without a jury, the contingency is
provided for by this section of the code (§3942), which
declares that if the court "is about to convene and there
have been no juries drawn for the same, it shall and
may be lawful for the judge to draw juries, so many as
may be necessary for such court, and cause them to be
summoned accordingly," etc. So in either event,
whether it was a prolongation of the court or whether
it was about to convene for another session of the court
(and did so convene), the judge, in our opinion, had the
power and authority to draw the jury as he did. It
may not be quite obvious that the drawing of this jury
falls within the exact letter of the statute, but that the
spirit and meaning of the statute extend to it is mani-
fest. Most courts would still hold that even if it was
error for the judge to draw and summon the jury as he
did, it was not such an error as would work a reversal of
the case. In *Rafe* v. *State*, 20 *Ga.* 60, it was held by
this court that "the statutes regulating the selection,
drawing and summoning of jurors are intended to dis-
tribute jury duties among citizens of the county, pro-
vide for rotation in jury service, and to insure at each
court the attendance of persons to serve on juries, and
are no part of a regulation to secure to parties *impartial*
juries." This decision has been approved and followed
by many courts and text-writers. In 1 Thompson on
Trials, §34, p. 32, it is said: "Statutory provisions re-
specting the drawing of the panel are generally regarded
as directory merely, so that irregularities therein, unless
plainly operating to the prejudice of the challenging

party, form no ground for challenging the array." See also authorities there cited. The same principle is announced in Thompson and Merriam on Juries, §143. See also Colt v. Evans, 12 Conn. 242; Burlingame v. Burlingame, 18 Wisc. 299; State v. Knight, 61 Mo. 373; State v. Pitts, 58 Mo. 556; State v. Massey, 2 Hill (S. C.), 379. And see Friery v. People, 54 Bab. (N. Y.) 319, 336, where the reasoning in Rafe's case, supra, is quoted and approved. It is not claimed that the defendant was injured or prejudiced in any way by putting this jury upon him. There is no complaint that the jury which tried him was not as fair and impartial as any jury which could have been obtained in the county. After a long and tedious trial of three weeks, there is no intimation in the record of any misconduct or unfairness, of any expression of opinion or any bias or prejudice on the part of any one of the jurors against the accused. The law guarantees to the defendant a speedy trial by a fair and impartial jury. If he has had that, why (it may be asked) should the case be reversed and a new trial ordered simply because the judge summoned the jury to attend four days earlier than counsel for the defendant thought was proper? Why should this long, laborious and expensive trial be gone over again because the original panel sworn at the beginning of the week was not put upon the prisoner? If there had been any irregularity in the original panel put upon him on his first trial which commenced on Monday, and the array had been challenged for that reason and the challenge sustained, the court would have had the right even then to have the sheriff summon a sufficient panel; and some courts hold that the sheriff may summon the same jurors who were on a previous panel to which a challenge had been made and sustained, unless the challenge was sustained on the ground of fraud. 1 Thomp. Tr. §39; Thomp. and Merriam on Juries,

§147; Caperton *v.* Nickel, 4 W. Va. 173; State *v.* De-
gonia, 69 Mo. 485; State *v.* McCurry, 63 N. C. 33;
Smith *v.* State, 4 Neb. 277.   With courts generally, as
we gather from the authorities, the. great and controll-
ing question is, did the accused have a fair trial by an
impartial jury?   If so, the law has been complied with,
and he has no right to complain that his challenges.
were not sustained.   In the case of Grisson *v.* The State,
8 Tex. App. 398, the court say: "If a defendant has
been tried by an impartial jury, the court may have
committed a hundred errors in the mere process of em-
panelling without subjecting its action to revision
upon appeal."   The Supreme Court of the United
States, in the case of Northern Pacific Railroad *v.* Her-
bert, 116 U. S. 642, held that the accused cannot com-
plain if he is tried by an impartial jury.   See also Hays
*v.* Missouri, 120 U. S. 171.

6. The second ground taken in the challenge was,
that the court ordered the tales jurors who had been
summoned to appear on Monday for the first trial, and
who had not been put upon the prisoner, to return the
next day.   There is no complaint that these talesmen
were not properly summoned in the first instance. Hav-
ing been properly summoned and being in attendance
upon the court, the judge, in our opinion, had the right
to order them to return the next day, and did· not err
in so doing.

7. The next ground taken in the challenge is, that
the judge during the trial when additional talesmen
were needed, drew their names, some of them from the
grand jury-box, and some of them from the petit jury-
box.   Counsel contend that the judge had no authority
to draw the tales jurors in this manner.   We do not
agree with counsel in this view of the law.   The act of
1881, embodied in the latter part of section 3935 of the
code, expressly provides that " whenever panels of forty-

eight jurors, or successive panels of jurors of any number, are required by law to be made up for the trial of any person charged with an offence punishable by death or imprisonment in the penitentiary, the presiding judge may, in his discretion, draw the tales jurors from the *jury-boxes* of the county, and order the sheriff to summon tales jurors as now provided by law." The uniform practice in the superior courts, so far as I know, since the passage of this act, has been that the judge, when a great number of jurors are required, draws from both boxes. And the statute expressly authorizes this; for it does not say that he may draw from the petit jury-box, or from the grand jury-box, but from the "jury-boxes." And this was a wise provision in the law, for the reason that when the names of the talesmen are drawn by the judge from the boxes, it prevents the sheriff and his officers from selecting the friends of the accused or of the prosecutor. It is wise, too, because, under the law for the selection of jurors, the most upright and intelligent men are put in the grand jury-box. If the judge were to confine himself to the petit jury-box in the drawing, the most intelligent and upright men in the community might not be called upon to serve upon the jury in criminal cases. Only two-fifths of the qualified jurors in the county can be placed in the grand jury-box, and we presume that when the judge drew five from the grand jury-box and ten from the petit jury-box, he had in view this proportion. If the judge had directed the sheriff to summon the talesman without drawing them from the box, the sheriff would have had the right, and it would have been his duty, to summon grand jurors and petit jurors indiscriminately. We think, therefore, that the judge did not err in overruling the challenge upon this ground.

This disposes of all the preliminary motions made before the commencement of the trial, which were excepted

to *pendente lite* and made grounds for new trial in the original and amended motion.

8. We now come to the original motion for a new trial, and omitting for the present the discussion of the usual grounds that the verdict is contrary to law, evidence, etc., we will take up the 3d ground of the motion, which complains that "the court refused to give in charge to the jury the following written request to charge, being the same request that was presented to the court at the first trial of this case, and which was then given with certain qualifications. The defendant adopted the qualifications then made by the judge, and as qualified, the defendant at this trial requested the same to be given; all of which the court erred in refusing to give." Then follow fifteen paragraphs, lettered from "a" to "n" inclusive, covering eight pages of printed matter. We have carefully read these requests several times, and we do not think the court erred in refusing to give them to the jury. They were long and argumentative, some of them exceedingly argumentative, and the court for this reason should have declined to give them. Stript of their phraseology, they amount to this: that the jury should be perfectly impartial and without bias, should decide the case from the evidence and not from rumor or public clamor; that before they could convict the prisoner, the evidence must show him to be guilty beyond a reasonable doubt, and that if any circumstances which were claimed by the State to be incriminating were not established beyond a reasonable doubt, they should be cast aside and not be considered in making up the verdict. Outside of the argument in the request, these are the legal propositions, in substance, which the court was asked to charge the jury. We have read the charge of the court and such of the defendant's requests as were given by the court, and we think that all of these propositions are fully covered therein. There

was, therefore, no error in refusing to give them in charge in the form requested.

9. The 5th and 6th grounds will be considered together. They allege as error the refusal of the court to allow defendant's counsel to ask the jurors, after they were sworn on the *voir dire*, and after having answered the four statutory questions so as to qualify themselves, and after the jurors were put on the defendant, any questions whatever; especially certain questions which the defendant's counsel proposed to ask in order to ascertain if the jurors understood what was meant by the words bias and prejudice, and what the jurors meant when they answered that they were perfectly impartial between the State and the accused, and whether they did not have a settled and fixed opinion that the defendant was guilty, and whether they did not then entertain that opinion. Counsel for the defendant insisted that, under the constitution of Georgia and the constitution of the United States, he was entitled to a fair trial by an impartial jury, and had the right to ask other questions than those prescribed by the statute in order to ascertain whether they had any fixed opinion as to the guilt or innocence of the accused; and contended that the refusal of the judge to allow these questions to be asked, or to ask them himself when requested by counsel for the defendant, deprived the defendant of a constitutional right; the court holding that it would not ask any question at the request of the defendant where the juror had answered the statutory questions categorically, but would only ask when the answer of the juror should disclose some misunderstanding of the statutory question asked, as the court did in two or three instances.

This court has held steadily since the passage of the act of 1856, embodied in section 4682 of the code, that counsel for the State, or for the defendant, cannot ask

the jurors upon the *voir dire* any other question than those prescribed by the statute. See cases of *King*, 21 *Ga.* 220, 225 ; *Pines*, 21 *Ga.* 227, 336, 237 ; *Guilford*, 24 *Ga.* 325 ; *Monday*, 32 *Ga.* 672 ; *Nesbit*, 43 *Ga.* 238 ; *Carter*, 56 *Ga.* 467 ; *Dumas*, 63 *Ga.* 600; *Cox*, 64 *Ga.* 404; *Johnson*, 65 *Ga.* 94 ; *Simmons*, 73 *Ga.* 609. This court has almost as frequently held that it is the right and duty of the trial judge, when he sees that a juror does not understand the statutory questions, to explain them to him in order that he may answer them intelligently, it being always left to the discretion of the judge whether he will change or vary the questions so that the juror might the better understand them. See cases of *Fogarty*, 80 *Ga.* 460 (9, 10), *Henry*, 33 *Ga.* 441, *Mitchell*, 22 *Ga.* 212, 232, 233, and *King*, 21 *Ga.* 220, 225.

The judge, therefore, did not err in refusing to allow counsel for the defendant to ask these questions at the time he proposed to do so ; nor did he err in refusing to ask them himself at that time, nor in refusing to explain the meaning of the words "prejudice," "bias" and "perfectly impartial," when he saw that the jurors understood the questions themselves.

But it is argued by counsel for the defendant that jurors might answer these questions so as to qualify themselves as jurors, and still entertain a prejudice or fixed opinion as to the guilt of the accused ; and that unless the defendant is allowed to ask additional questions so as to sift the mind of the juror, the juror might be accepted on the jury when totally unfit to serve by reason of having a fixed opinion as to the guilt of the accused. We do not see how this can be true if a juror is "upright and intelligent," as our law requires him to be before his name can be placed in the jury-box. It seems to us that if the statutory questions are answered honestly and intelligently, the juror selected

thereunder must be fair and impartial. Before he can be accepted and placed upon the panel, he must swear that he has not formed and expressed any opinion as to the guilt or innocence of the accused, from having seen the crime committed or having heard any of the testimony delivered on oath; he must swear that he has no prejudice or bias resting upon his mind for or against the accused, that is, that he has not prejudged the case, and that his mind is not inclined or does not lean towards or against the accused; and that he is perfectly impartial, that is, stands perpendicular, between the State and the accused. It appears to us that questions could not be made more searching than these, in order to determine the state of the juror's mind.

But the law of Georgia does not stop there. If counsel for the State or for the accused is dissatisfied with the answer of the juror, he has the right under our code, §4682, to put the juror upon the court as a trior, and to show by evidence that the answers, or any of them, of the jurors are untrue. The judge acting as a trior is not confined to the statutory questions, but in order to test the juror's qualification, may ask him any question except such as will tend to inculpate or disgrace him. As early as the case of *Copenhaven* v. *State*, 14 *Ga.* 22, this court said (page 26): "The triors, also, may examine the juryman challenged upon his *voir dire* as to the leaning of his affections, or whether he has given his opinion beforehand, and ask all other questions which may enable them to test his impartiality, provided they do not interrogate him as to facts and circumstances which tend to his infamy or disgrace." As far as we know, this has been the practice in courts in this State from that time to this. So we think the machinery employed by the State for the purpose of procuring fair and impartial juries to try accused persons, is ample, and we think, also, that the legislature

had the power to prescribe what questions should be asked jurors upon their *voir dire*, and to prescribe that when these questions were answered properly, the jurors should be *prima facie* competent to try the case, and that no other questions should be asked them by counsel for the State or the defendant, than those prescribed; especially when the same act declares that if either party is dissatisfied, the juror may be put upon the court as a trior. The mistake counsel for the defendant made was, in requesting to ask, or that the court ask these questions, at the wrong time. If he had objected to the juror put upon the court as a trior, doubtless the court as a trior would have asked any proper question to test the juror as to his qualification; but as this was not done, and he proposed to ask the questions at the wrong time, he cannot now complain that the court refused to grant his request.

But it is urged by counsel for the defendant that the putting of a juror upon the court as a trior is a harsh proceeding, as it is an effort to convict a juror of false swearing, and on such an issue the juror could not be compelled to swear against himself; that the putting of the juror upon the court as a trior is calculated to prejudice the juror against the defendant; and that only in a few instances will the defendant be prepared to prove that the juror had a fixed and settled opinion. We think the learned counsel is somewhat inconsistent in this position. In his motion to change the venue he offered to prove that all the jurors in the county were disqualified by reason of having fixed and settled opinions as to the guilt of the accused, but on this branch of the case he contends that this could not be proved in the case of the jurors put upon him. It seems to us that if he was prepared before the commencement of the trial to prove that every juror in the county was disqualified, he certainly could have proved

that the limited number of jurors put upon him were disqualified. Whether this is so or not, this is the mode established by law for proving the disqualification of jurors in criminal cases, and we think the legislature had full power to prescribe the manner in which their qualification should be tested; and it has been so ruled in *Rafe* v. *State, supra.* We think, therefore, that the court was right in refusing to allow the defendant's counsel to propound the questions at the time he asked to do so, and did not err in refusing himself to propound them at that time, and that he was right in holding that this section of the code, prescribing what questions should be propounded, was not in violation of the constitution of Georgia or the constitution of the United States. *Blackman* v. *State, supra.*

10. The 7th ground of the motion complains that the court erred in refusing to explain, at the request of the defendant, to the first and second panel of jurors, the proper and legal meaning of the words "bias" and "prejudice," and the meaning of the expression "perfectly impartial," and in refusing to say to said panels that if they entertained a fixed and settled opinion as to the guilt or innocence of the defendant, and still entertained that opinion, no matter whether founded upon newspaper reports, rumors or hearsay, this was prejudging the case. This court has frequently held that it is within the discretion or judgment of the trial judge to make these explanations or not. While it is the privilege of the trial judge to inform the jury of the meaning of these words, yet if he should fail to do it, it would not be error. The judge is in a position to determine for himself, when each panel is put upon the prisoner, whether the jurors therein are sufficiently intelligent to understand the questions propounded to them. He is generally acquainted with the jurors in his circuit. One or two panels may be composed of

v 85-7

very intelligent men, and it would be useless labor on the part of the judge to explain these questions; other panels might not be so intelligent, and the judge, observing this, doubtless would make the proper explanation; and in the present case this may be the reason why the judge declined to make explanations to the first two panels, and did make them to the others.

11. The amended motion consists of fourteen grounds, the first two of which have already been discussed. The third ground complains that the court erred in admitting the testimony of Barron and Ayres, the objection to their testimony being that they had been members of the jury that tried the case before, and that their examination of the drawers, in regard to which they testified, was while they were discharging their duties as jurors, after they had repaired to the jury-room and were making up their verdict, and must necessarily have been in connection with the other testimony introduced in the case, and that it was impossible for these witnesses to say what effect the other testimony in the case had in causing their minds to reach the conclusion that they saw the print of a hand.

This exception is not well-taken. The objection made is more against the weight of the testimony than against its admissibility. The objection might have been a good argument to the jury, and they might have been urged to attach little or no weight to it, but it is not a sound argument against its admissibility. Besides, it appears from the testimony of these witnesses, attached to this ground of the motion, that they did not come to the conclusion that it was the print of a hand upon the drawers from any other evidence than the drawers themselves. They say that they saw the bloody print of a hand when the drawers were exhibited at the first trial to the jury, of which they were members, and that the impression of a hand was still on them at the last

trial.   We know of no law or reason which would pre-
vent a person who had served upon the jury on a pre-
vious trial of the case, from testifying as to articles,
blood-stains, etc., which were exhibited to him at that
time.

12. The 4th amended ground of the motion for a new
trial alleges as error the admission by the court, over
the defendant's objection, of the testimony of Birdsong,
the jailer in charge of the defendant, who testified that
he overheard the defendant, while confined in his cell,
say: "Lord, have mercy upon me for what I have done;
the only thing I regret is killing my father."   Birdsong
further testified that this was all he heard; that he
could not say he heard all that Woolfolk said; that he
might have said something else before he got there.
There are three objections made to the admissibility of
this testimony: (1) that the witness did not hear all
that Woolfolk said on this occasion; that as he heard
only a part of what was said, it was inadmissible, for if
the witness had heard all that he did say, it might have
changed materially the meaning of the part the witness
said he heard; (2) that as Birdsong was the jailer in
charge of the defendant, it was against the policy of the
law that such testimony on the part of the jailer should
be received; (3) that it was against the policy of the
law that what a man should utter in prayer to his
Maker should be used in evidence against him.

The general rule of law is, that where the State puts
in part of the confession of the accused, the accused has
the right to put the whole of it in evidence; and there-
fore, under this rule, if Birdsong had heard the prisoner
say anything more upon that occasion, it would have
been the duty of the court to admit it in evidence; but
he says that he repeated all that he heard, and did not
know whether Woolfolk had said anything more or not
before he got there; that he did not hear it.   If there

was nothing said, or if he heard nothing said, besides the language testified to, of course it was impossible for him to testify to it.    In the case of *Westmoreland* v. *State*, 45 *Ga.* 225, it was held: "That a witness did not hear all of a conversation of defendant about which he is called to testify, is no ground of objection to his stating so much of it as he did hear." In the case of *Loyd* v. *State, Id.* 57, one of the grounds of the motion for a new trial was, that the court erred in not ruling out Murphy's statement of a conversation of which he heard a part.    While the court did not pass upon this ground specially, it refused to grant a new trial, holding in effect that there was no error in the admission of this testimony, which was material and incriminating and doubtless affected the verdict.    In the case of The State *v.* Covington, 2 Bailey (S. C.), 569, it was held that "the rule that all of a party's declarations or admissions must be taken together, does not exclude evidence of a conversation overheard between himself and another person, although the witness did not hear the whole of the conversation.    All that was heard must be stated, but that which was heard is not to be excluded because more might have been said on the same subject which was not heard; and the rule applies equally where the party is indicted for a capital felony as in the trial of a civil action." The case of The People *v.* Gelabert, 39 Cal. 663, relied on by counsel for the defendant, was a case where more was said than what the witness testified to.    The prisoner in that case was a Spaniard, and spoke broken English; the witness said he understood a very little Spanish, but did not understand all that defendant said in Spanish, and it was shown that he did not, or could not, testify to all that the prisoner said, because of his inability to understand the prisoner's language.    In this case Birdsong testified to all that he heard the prisoner say, and there is no evidence whatever that the prisoner said any more.

There is nothing in the second objection. The law does not disqualify a jailer from testifying as to the voluntary acts or confessions of prisoners under his charge. Whart. Cr. Ev. §672, and cases cited.

We have given the third objection much reflection, and as far as we can ascertain, this is the first case in the judicial history of England or the United States in which the same question has arisen. After mature consideration, we have arrived at the conclusion that it is not against public policy to allow a prayer of a prisoner, which inculpates him, to be given in evidence. If this had been a confession to a priest or clergyman, instead of to God, under the law of England and of a majority of the States of this country, it would have been admissible. "Though the law of England encourages the penitent to confess his sins, 'for the unburthening of his conscience, and to receive spiritual consolation and ease of mind,' yet the minister to whom the confession is made is merely excused from presenting the offender to the civil magistracy. . . In all other respects he is left to the full operation of the rules of common law, by which he is bound to testify in such cases as any other person when duly summoned." 1 Greenl. Ev. §247. See Hageman on Privileged Communications, where this question is discussed and many cases cited; also, 1 Whart. Ev. §596 *et seq.*; Taylor Ev. 787. And under our code, §3794, the fact that a confession is made under a spiritual exhortation does not exclude it. Under the law, communications between husband and wife, and attorney and client, are privileged, and neither the husband nor the wife can be compelled to testify to such communications, nor can an attorney be compelled to testify to anything his client says about his case; yet it has been frequently held that if a third person overhears the privileged communication, he can be compelled to testify as to what he heard. People *v.* Barker, 27 N. W.

Rep. (Mich.) 539 ; Goddard *v.* Gardner, 28 Conn. 172 ; State *v.* Center, 35 Vt., 378 ; Hoy *v.* Morris, 13 Gray, 519 ; Com. *v.* Griffin, 110 Mass. 181, where it was held that a private conversation between husband and wife, who thought that no one overheard them, may be testified to by a concealed listener. Analogizing the case under consideration to these cases, we think the evidence was admissible. Though no direct question upon it was made, a prayer offered by a prisoner in jail and overheard, was in evidence and considered by this court. in the case of *Betts* v. *The State,* 66 *Ga.* 508, 516.

13. Another point made in this ground of the motion is, that the court erred in refusing to allow the defendant to prove by the jailer other prayers made by the prisoner on different occasions, in which he prayed God to forgive those who had unjustly accused him. There was no error in excluding this evidence. The rule is, to admit inculpatory declarations or confessions, and to exclude those which are exculpatory, when disconnected therewith.

14. The 5th amended ground alleges that the court erred in admitting the testimony of Birdsong, the jailer, that on one occasion when Woolfolk was reading a paper, he (Birdsong) asked him, "Who will get the property?" and that Woolfolk replied: "It is not worth while to mention that; my sisters will get the property. When the proper time comes I will settle that question." · We think the court should have excluded this testimony, because it was immaterial and irrelevant. We cannot see that it had any bearing on the issue in the case. If it meant anything at all, it meant simply that at the proper time the prisoner would relinquish his right in the property to his sisters. As we cannot see that the prisoner was injured by its admission, we will not reverse the case upon that ground alone.

15. The 6th amended ground alleges that "Anderson James (colored), a witness introduced by the State, and who lived on the Woolfolk place, had denied giving to Augustus Trippe (colored) a full statement as to how the killing was done, and amongst other things, had denied saying that Pearl Woolfolk came very near escaping them by running under the bed. The defendant asked permission of the court to show by Judge Robert P. Trippe that Augustus Trippe had said to him that he heard Anderson James give a minute account of how the killing took place, and that Pearl Woolfolk came very near escaping from them by running under the bed; and offered to prove by Judge Trippe that the said Augustus had become so frightened that he denied even to Judge Trippe that he had ever made this statement. This evidence was offered that the jury might draw the inference that the witness was frightened. The court refused to allow this testimony. The defendant's counsel then offered to prove that Augustus Trippe had become frightened, and had denied knowing anything about the case, when he knew most material evidence for defendant, without stating to the jury what Augustus Trippe had said to Judge Trippe, but simply to prove that he had said something in connection with the case to Judge Trippe, and had been so frightened by outside pressure as to deny that he had even said anything to Judge Trippe. The court also refused to allow this testimony." There was no error in refusing this testimony. The statement of it is sufficient to show that it was inadmissible. It was an effort to put before the jury that Judge Trippe had heard Augustus Trippe say that he (Augustus) had heard Anderson James say something indicating that he (Anderson James) knew more about the killing than he was will-willing to tell.

16. The 7th amended ground alleges, in substance,

that Nancy Bird testified that she saw a barefooted negro talk with Green Lockett on the night of the killing; and that Mr. Ross had testified that, on Monday morning after the killing, a barefooted negro was seen by him eleven miles from the Woolfolk place, that the negro was a stranger in the neighborhood, and that he worked for him half a day and left; that about a month afterwards this negro was arrested by Kitchens, the sheriff of Cherokee county, and said his name was DuBose; that the negro was then in court, and was a madman or lunatic. The defendant offered to show by Kitchens that when this negro was arrested, 176 miles from the Woolfolk place, and was charged with being an escaped convict, he replied: "How could he be an escaped convict, when he was on the Woolfolk place the night the nine were killed?" and mentioned Green Lockett, and said that he had hid out on the Woolfolk place, and that a negro woman named Ann had brought him his breakfast. The wife of Anderson James was named Ann. This testimony was offered to identify DuBose as the unknown barefooted negro who, according to the testimony of Nancy Bird, had a conversation with Green Lockett on the night of the killing. The court properly rejected this testimony; it was so clearly inadmissible that we deem it unnecessary to discuss it.

17. The 8th amended ground alleges that during the progress of the trial, Miss Sallie Woolfolk and Mrs. Reese had testified as to the feeling of the defendant towards his stepmother, and that he had said, in substance, that she was the meanest woman in the world, the damnedest meanest woman in the world, and that he hated her. The defendant moved to rule out this testimony on the ground that he was now on trial for the murder of his father, and it was not admissible to give in evidence his feelings towards Mrs. Woolfolk. The court refused to rule out the testimony, holding

that "the motive which induced the defendant to kill any one of the family might very well be held to have induced him to kill the others." We think the court was clearly right in this ruling.

18. The 9th and 10th amended grounds complain that the court refused to allow the defendant to prove certain acts and declarations of John Jeff. These acts and declarations were, that when Walker, a week after the killing, was cross-questioning John Jeff, the latter became excited and wanted to get away, stating two or three times that he had to look after the feeding of the chickens. The court also refused to allow the defendant to prove what Jeff had said about the tracks and about the ax, and where he was on the night of the killing; that he said if he had seen Tom Woolfolk with an ax on Friday evening, he would have gone right straight and told his father about having seen him with the ax; and that Jeff had made various contradictory statements as to where he was on the night of the killing. This testimony, it is presumed, was offered to meet the decision of this case in regard to the admissibility of Pennington's testimony when the case was here before. We do not think it was admissible. We said, in regard to the admissibility of Pennington's testimony, that "a single isolated threat of a third party, unconnected with any other act or circumstance of the killing, is inadmissible. 'While evidence tending to show that another party might have committed the crime would be admissible, before such testimony could be received there must be such proof of connection with it, such a train of facts and circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts disconnected, and outside the crime itself, cannot be separately proved for such a purpose.'" 81 *Ga.* 565. We do not think that the testimony set out in these two grounds, taken to-

gether with Pennington's testimony, was sufficient to connect Jeff with the killing. The acts and declarations sought to be proved occurred some time after the killing. There is nothing in any of them to indicate that Jeff was connected with the killing, and the court did not err in rejecting the testimony. This testimony being rejected, the admission of Jeff made to Pennington, the rejection of which is complained of in the 11th ground, stands exactly where it stood when the case was here before; and we see no reason to change our ruling upon this point.

19. The 12th ground complains that the court refused to allow the defendant to ask, on the cross-examination of Bone Davis, certain questions which counsel stated he proposed to ask for the purpose of showing that the witness was crazy. The substance of these questions was, whether the witness did not imagine that some one was trying to do him harm, and whether he did not imagine that he traced a cart running up the branch, and whether he was not down in the woods when the neighbors came and tried to get him away, and he refused to go and tried to point out the cart tracks in the branch; also whether it was true that some time in March he went into the woods with his pistol, and that the neighbors had been sent for upon the ground that he was crazy, and whether he did not insist that somebody was trying to do him great harm, and undertake to show tracks of a cart, etc.; whether he was laboring under the impression that his own mother was trying to injure him and trying to create a separation between himself and his wife; whether he did not drive his mother away from his house with a pistol; whether he did not get up in the morning and imagine he saw tracks all around his house; and whether he did not become violent and take out his pistol and threaten to shoot to the east and the west;

whether he did not say that his mother should not come back to his house, and if she did come he would put her in jail; whether his father was not insane, etc., etc.

While a party has a right to thoroughly cross-examine a witness called against him, this right must end at some time. We have examined the record as to the cross-examination of this witness, and find it to have been thorough and sifting. Many questions were asked and answered upon the line indicated in this ground of the motion, and some of the questions set out in this ground were asked and answered. While, perhaps, it would have been more satisfactory to the defendant's counsel for the court to have allowed the examination to continue on this line, yet, if it was error at all to limit the examination, it was not a sufficient error to require the grant of a new trial, especially when defendant's counsel, as appears from the record, had introduced testimony as to the same things which he proposed to prove by this witness.

20. The 13th amended ground alleges that the court erred in permitting the State to put in evidence, over objection of defendant, a certain pair of socks which had been found in the Woolfolk well about two weeks after the killing, one witness testifying to their identity. The objection to this testimony was that there was no sufficient identification of the socks offered in evidence. This was a question for the jury, and might be safely left to them.

21. The 14th amended ground complains that the court erred in refusing to admit the testimony of McKay and Mrs. Cowen. Mrs. Cowen testified that she was at her father's house when the news came that George Cadwell had broken out of jail, and that she got up in the night to get some water for her baby, and dropped the dipper into the bucket, and that this caused her

father to jump up suddenly very much frightened. The defendant then offered to prove by Mrs. Cowen what her father said, to wit: that since he had put .George Cadwell in jail, the church had presented a long petition that Cadwell be turned out, which request he had refused to comply with, and that he was very uneasy and apprehensive for fear Cadwell and his folks or friends would do him some injury. This evidence was offered as Mr. Woolfolk's explanation of his fright. The defendant also offered to prove by Mr. McKay that Mr. Woolfolk, the deceased, had expressed considerable apprehension of danger from the negroes on his place and had said that he was afraid George Cadwell might not be kept in the penitentiary long enough, and that he would get out and do him some serious injury.

There was no error in refusing to admit this testimony. It was immaterial and irrelevant, and would shed no light upon the real question in the case, as to who was the perpetrator of the crime. We have shown that it was inadmissible to prove the threats of Jeff. 81 *Ga.* 551, *supra.* If these threats were not admissible for want of proper evidence to connect Jeff with the crime, certainly the fright of an old man, suddenly awakened by the dropping of a dipper in a bucket, and his apprehension of injury from a person he had prosecuted and sent to the penitentiary, could not be admissible. When the case was here before, we held that " declarations made by one of the persons killed to her father, nearly a week before the killing, as to her fear that her life was in danger from the defendant, and that from the way he treated her she expected to be killed, were inadmissible." 81 *Ga.* 552(3). Still less would apprehensions as to a person other than the defendant, not connected by other evidence with the crime, be admissible. It may have been the theory of the defendant that his father and his family were killed by the ne-

groes on the place, but it has been his misfortune that he has been unable to show it, or by any proper evidence connect any of them with the killing.

22. The only remaining question is presented by the 1st and 2d grounds of the original motion for a new trial, which complain in substance that the jury found contrary to law and the evidence. The evidence sent up in the record is contained in about 1,100 pages of printed matter. We have gone over this testimony and have carefully read every material part of it, and have had an abstract made of all the material portions; and after a careful consideration thereof, we think there was evidence sufficient to authorize the jury to find the defendant guilty. Two juries having found the same verdict, and the able and learned judge who presided at the trial being satisfied with their finding, we do not feel authorized to disturb it.          *Judgment affirmed.*