Monday, (a slave,) plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. The only questions to be propounded to a juror on trial for competency, are those prescribed by the Act of 1851.
2. A juror having conscientious scruples as to capital punishment is incompetent to try a case involving capital punishment.
3. Declarations of the prosecutor, the person on whom the assault was made, at or immediately after the assault, are admissible as parts of the *res gestœ*.
4. It is the right of any white man to arrest a slave on the public highway upon a reasonable suspicion that the slave has in possession stolen property, and the negro has no right to resist such arrest.
5. An assault with intent to murder may be committed without the use of weapons likely to produce death.
6. It is proper for the Court, in charging the jury, to direct them to disregard all outside considerations, and to determine the case by the proof alone.
7. When a party, during the trial, discovers material testimony, and the Court will neither, on motion, continue or suspend the cause to enable the party to obtain the benefit of such testimony, a new trial must be allowed for that purpose

Assault with intent to murder, in Sumter Superior Court. Tried before Judge ALLEN, at the April Term, 1861.

This was in indictment in which the grand jury "charge and accuse Monday, a slave, of the county and State aforesaid, with the offence of an assault with intent to murder, for that the said defendant, Monday, a slave, on the fifteenth day of October, in the year eighteen hundred and sixty, in the county aforesaid, did then and there unlawfully, and with force and arms, willfully, feloniously, and of his malice aforethought, make an assault at and upon one Andrew Bass then

and there being, said Andrew then and there being a white man, with intent him, the said Andrew Bass, then and there wilfully, feloniously, and of his malice aforethought, to kill and murder, to the damage of said Bass, contrary to the laws of said State, the good order, peace and dignity thereof."

The defendant being arraigned, pleaded not guilty.

Pending the organization of the jury to try said case, one of the jurors, W. A. J. McKnight, being called, was asked the questions prescribed by the statute, and his answers rendering him *prima facie* a competent juror, counsel for the prisoner put the juror upon the Court as a trior, and proposed to ask said McKnight if he had not talked with the prosecutor about this case, and expressed to said prosecutor an opinion against the prisoner? And if he did not have a fixed opinion against the prisoner? Upon objection being made thereto, the Court would not permit the prisoner's counsel to ask the juror these questions, holding that no question could be propounded to the juror except those prescribed by the statute, and that if the prisoner's counsel desired to show that the juror was incompetent, it must be done by some one else.

Prisoner's counsel then swore ANDREW BASS, the prosecutor, who testified: That he may have had a conversation with the juror about this case, but that if anything was said, he did not recollect what it was.

The presiding Judge pronounced the juror competent, and prisoner's counsel was forced to challenge the juror peremptorily.

The jury being empanneled, the testimony adduced on the trial of the case disclosed, in substance, the following facts:

Some time in the month of October, 1860, the prosecutor (Andrew Bass) was going out of the town of Americus, on his way home, from the house of a neighbor, where he had been sitting up with a sick child—it was early in the morning, between daybreak and sunrise, and as he passed along, his attention was arrested by a noise in the bushes, as·of something running; he stopped, and in a few minutes some one, appearing to be a negro, came into the road ahead

of him; the negro came toward him and met him; Bass asked who it was; the negro replied, Monday McRea; the negro had a bottle in his hand; Bass passed the negro, and as he arrived at the place where the negro came into the road, he discovered a sack lying by the road. He put his foot on it, to see what it was, and whilst he was examining the sack, the negro walked back to where he was. Bass asked the negro what was in the bag, and he answered, that it contained nothing but clothes. Bass and the negro took hold of the sack about the same time. Upon examination, the sack was found to contain bacon. Bass told the negro to pick it up, and he would go with him to town, but the negro insisted on going to a house near by. Bass then told him that he intended to take him to town, but the negro still insisted on going to the other house. Bass then told him that if he did not go on he would knock him down. The negro becoming more obstinate, Bass struck him once or twice with his fist. Bass was holding to, and pulling the negro along, when, somehow or other, they both fell to the ground. The negro caught Bass by the throat and choked him severely, so much so that he could scarcely get up from the ground. Bass would cry for help whenever he could get his breath sufficient to do so. His cries at last attracted the notice of persons who came to his relief, and as they came up the negro ran off. Bass' throat was skinned on both sides of his neck, by the negro's finger nails, and was badly hurt and much exhausted. Bass had known Monday (the prisoner) for ten years, and testified, that he felt certain that the negro was the prisoner, Monday. In about one-half or three-fourths of an hour after the scuffle with Bass, Monday was in his mistress' kitchen putting on his shoes.

Amongst other testimony adduced by the State, was that of one John C. Beard, who testified: that attracted by the cries of Bass, he went to where he was, and some one ran off; that he asked Bass what was the matter? to which Bass replied, that Monday McRea was trying to choke him to death.

This testimony of Beard was objected to, but the objection was overruled.

Dr. Thomas C. Lamar, one of the witnesses for the State, testified, amongst others things, that he was unable to state how long it would require for strangulation to produce death; that it would depend upon the extent to which the air passages were closed; he would say it would require but a few minutes; that he would suppose severe choking or strangulation would produce death, by cessation of respiration, if the air passages were completely closed, in a few minutes.

This testimony was objected to by the prisoner's counsel, but the Court overruled the objection.

The prisoner relied on the proof of an *alibi*, as one of the grounds of his defence, and in support of this defence, introduced three witnesses to prove that he was at home, at his mistress', (Mrs. McRea's,) at the time the difficulty occurred between the negro and Bass.

This defence was met by the State with testimony, going to show that one of the defendant's witnesses was unworthy of credit, on account of his general bad character, and that another had made statements, out of Court, at variance with his testimony in Court; and also, by the testimony of one Mrs. Barfield, who testified, that early on the morning of the difficulty she saw Monday going toward Mrs. McRea's, and after he passed some time, there passed some dogs and men, going in the same direction he was and following on his (Monday's) path.

There was much other testimony, but the foregoing statement is sufficient to illustrate the decision of the Supreme Court, upon the points presented in the record.

After the testimony had closed, and the Court had taken a recess for dinner, counsel for the prisoner learned, during the recess, that he could prove by James W. Ragan, that Mrs. Barfield was mistaken in her testimony, and that the dogs did not run on the path or track of Monday, or in the direction, as indicated by Mrs. Barfield; that when Mrs. Barfield saw Monday, he was under arrest, and in custody of the marshal and guard, going to the guardhouse; that after

the dogs had ceased running, Ragan went to where Monday was, his dogs bayed him, and this was the direction indicated by Mrs. Barfield's testimony.

When the Court re-assembled, after dinner, prisoner's counsel announced to the Court what he had learned during the recess, and also stated further, that in conversation with Mr. Ragan, he (Ragan) informed the counsel that he had told the prosecutor that his testimony would do the State no good, and that he had better not swear him; that thereupon the prosecutor let him off; that he had been subpœnaed by the prosecutor. Counsel for the prisoner then instructed Ragan to be in Court upon its re-assembling after dinner. Counsel also stated to the Court that he had not known that he could prove these facts by Ragan until the recess. This statement was verified by the affidavits of Hon. Lott Warren and the witness, Ragan, and upon this showing counsel for prisoner moved the Court to suspend the case until Ragan (who was gone some four or five miles in pursuit of a runaway slave) could be sent for to testify; or, if the Court would not suspend the case, then to continue it for the purpose of enabling the prisoner to obtain the benefit of Ragan's testimony.

The Court overruled the motion, and refused either to suspend or continue the case.

After the testimony had closed, the Court charged the jury, amongst other things:

" That any white man had the right to arrest any slave on the public highway, if he had a reasonable suspicion that the slave had in his possession stolen property."

The jury returned a verdict of guilty against the prisoner, and his counsel then moved to arrest the judgment in said case on the grounds:

1. Because it is apparent, upon the face of the indictment, that no deadly weapon was used by the prisoner.

2. Because the indictment does not allege that the assault was committed with any instrument or weapon, or hands or fists, or anything else, with which such an offence can be committed, the indictment simply stating that the prisoner

committed an assault with intent to murder, without stating how or in what manner, or by the use or employment of what means, or of any means.

3. Because the indictment does not allege that the prosecutor, and party assaulted, was a free white person.

This motion was overruled by the Court, and defendant by his counsel, excepted.

Counsel for defendant then moved for a new trial of said case, on the following grounds:

1. Because the Court erred in adjudging W. A. J. McKnight a competent juror, and refusing to permit counsel for the prisoner to ask him the questions as hereinbefore stated.

2. Because the Court erred in admitting the testimony of Beard, as to the sayings of the prosecutor relative to who the person was that assaulted him.

3. Because the Court erred in allowing Dr. T. C. Lamar to testify as to the length of time that it required to produce death by strangulation or choking, no death having ensued.

4. Because the Court erred in charging the jury as hereinbefore stated, the first part of said charge being error, and the last part of it being unsupported by the evidence in the case.

5. Because the Court refused to charge the jury as requested by prisoner's counsel, as follows:

"That an assault with intent to murder is usually manifested by the use of some deadly weapon, the employment of which is ordinarily calculated to produce death," but after giving the charge, qualified the same by adding thereto: "that though usually so manifested, yet the offence of an assault with intent to murder might be committed without a weapon likely to produce death."

6. Because the Court erred in not charging the jury as requested, in writing, by prisoner's counsel, as follows:

"That prisoner's rights were to be considered with the same care and caution as if he were a white man, and the suspicions or apprehensions of insurrection or irrepressible conflict ought and must having nothing to do with this case, unless the evidence showed insurrectionary movements"—the

Monday *vs.* The State of Georgia.

employed counsel for the prosecution, in concluding the argument to the jury, urging the apprehension and the irrepressible conflict as a reason why they should convict the prisoner.

The Court charged in lieu of the request, "That the jury should disregard all outside considerations, and determine the case by the proof."

7. Because the jury found contrary to the evidence, and to the following charge of the Court, to-wit: "That the proof of an *alibi*, if sustained, is a good defence."

8. Because the jury found contrary to the following charge of the Court : "That the jury must be satisfied by the evidence beyond a reasonable doubt that it was the defendant that committed the assault on the prosecutor, or acquit."

9. Because the Court erred in refusing to suspend or continue said case, for the purpose of enabling the defendant to obtain the testimony of the witness Ragan, as hereinbefore stated, upon the showing made.

10. Because of the newly discovered evidence aforesaid of said Ragan.

The motion for a new trial was overruled.

The refusal of the Court to arrest the judgment, and to grant a new trial, are the errors complained of.

J. J. SCARBOROUGH and WARREN & WARREN, for plaintiff in error.

W. E. SMITH, Solicitor General, (represented by STROZIER,) for defendant in error.

*By the Court.*—LYON, J., delivering the opinion.

There was no error in the refusal of the Court to allow the juror, on trial for competency, to be asked whether he had not talked with the prosecutor, etc. The only question to be propounded to the juror are those prescribed by the Statute of 1856. King vs. The State, 21 Ga., 220; Pines vs. The State, 21 Ga., 236.

2. The juror having been asked, and answered that he had conscientious scruples as to capital punishment, without

Monday *vs.* The State of Georgia.

objection it was competent for the Court to discharge him for incompetency under the Act of 1856, notwithstanding the objection of counsel for prisoner.

3. It was competent for the declarations of Bass, the prosecutor, made so immediately after the contest between himself and prisoner, as testified to by the witness, Beard, to go to the jury as part of the *res gestæ* to illustrate the impression, on the mind of the prosecutor at the time, of the nature of the attack made on him by the accused.

4. We subscribe fully to the opinion of the Court below that it is the right of any white man to arrest any slave on the public highway if he has a reasonable suspicion that the slave has in possession stolen property. Such a principle is necessary to the proper discipline, government and protection of that species of property, and we think there was an abundance of evidence in this case to justify the suspicion of the prosecutor, and to justify him in an arrest of the negro under the circumstances, and the resistance of the negro was unwarrantable upon any pretext whatever.

5. We agree, too, with the Court that while an assault with intent to murder is usually manifested by the use of a deadly weapon, the employment of which is ordinarily calculated to produce death, still an assault with intent to murder might be committed without the use of a weapon that would be likely to produce death.

6. The Court also did right to exclude from his charge all allusion to the irrepressible conflict, and a dissertation on the relative rights of the negro to that of a white man, but in lieu thereof to tell the jury simply, as he did, to disregard *all* outside considerations, and to determine the case by the proof alone.

We do not think that the verdict was against the charge of the Court.

The defence relied on was, that the negro with whom Bass had the conflict, was not the accused, but some other; that Bass was mistaken; that he was deceived by the light, or some other cause; that the accused was not there, etc., and much negro testimony was offered in support of this position.

The evidence of Mrs. Barfield in rebuttal to all this testimony, to-wit: " that she saw the accused on the morning of the conflict, and before the time they carried him to the jail, passing her house going home; he was at the corner of the public square, and that after he passed some time, there passed some dogs and gentlemen going the same direction he was," if true, was corroborative of the testimony of the prosecutor, who could not consequently have been mistaken.

The testimony of the absent witness, James W. Ragan, " that the dogs did not run on the track of the accused," as testified to by Mrs. Barfield, was material to the defence in overcoming the effect of the testimony of Mrs. Barfield in that respect at least.   The verdict of the jury may have turned entirely on the evidence of Mrs. Barfield.   We do not say that it should, but it was testimony that the defendant had a right to have before the jury.   What effect it would have had upon the verdict, if any, we can not say.   That was for the jury to consider; but it was legitimate evidence for them, and after it was discovered by the counsel, under the circumstances, we think the Court ought either, in his discretion, to have suspended the trial long enough to procure the testimony, or have continued the trial to another term, upon the application, to enable the defendant to obtain the benefit or supposed benefit of the witness' testimony, and in not doing either the one or the other, we think the Court committed error, and this is all the error that we find in this record.

Let the judgment be reversed.