Henry, a slave, *vs.* The State.

33   441
85    94

33   441
108  390
33   441
e124 782

HENRY, a slave, plaintiff in error, *vs.* THE STATE, defendant in error.

1. In criminal trials, when a juror is on trial for competency, it is no error for the Court to explain the meaning of the questions put to him.

2. Nor is it error for the Court to sift the juror to ascertain that he has a correct understanding of the questions put to him or the effect of his answers to these questions—but the statutory questions or the effect of affirmative answers must not be disregarded.

3. A slave, who was a blacksmith, intending to whip his striker, another slave, struck him over the head one or more blows with an axe-helve—killed him, but with no intention, there being no evidence that the axe-helve was an ordinary helve or a weapon likely to produce death: *Held*, not to be murder, and a new trial granted on the ground that the verdict was not supported by the evidence.

Indictment for murder, in Dougherty Superior Court. Tried before Judge ALLEN, December Term, 1862.

Henry, a slave, the plaintiff in error, was put upon his trial for the murder of a fellow-slave, Gilbert, and a verdict of "guilty" found by the jury. The errors alleged are stated in the motion for a new trial made by his counsel, as follows:

1. That while selecting a jury, and after one juror had been sworn in chief, James Hamlin, one of the jurors on the panel, on being asked by the State, whether his mind was perfectly impartial between the State and the accused, answered, "he did not know what the question meant." The Court explained to him that "impartial" meant that he had no more disposition to convict the prisoner than to acquit him, or to acquit than to convict. The juror said he understood it, and wished to do justice. The question was repeated by the Solicitor General, and the juror again replied that "he did not understand it." The Court again explained, and the juror said as before, that he understood it, and wished to do justice. By the direction of the Court, the question was again put by the Solicitor General, when the juror answered that he did not understand the Solicitor General, but that he did understand the Court. To all this the prisoner objected; the objections were overruled and the juror put upon him; and the question being again repeated by the Solicitor General, the juror answered in the affirmative.

2. Because while selecting the jury, and after the first panel was put upon the prisoner, and one juror had been sworn in chief, John Sawyer, a *tales* juror, being sworn on his *voir dire*, in reply to the question asked by the Solicitor General, whether he had any bias or prejudice for or against the accused, answered that he had. The Court intervening then asked the juror, in the presence of the other *tales* jurors and the one previously empanelled, what he intended by saying that he had bias or prejudice? Did he know the boy previously, or was his prejudice from what he had heard? To these questions and the answer, counsel for the prisoner objected. The objection was overruled, and the juror answered that he did not know the boy. The Court then asked the juror if he was prejudiced against the prisoner or the offense, and he answered to both. To this also the prisoner objected.

3. Because on the prisoner's asking one of the witnesses, John, whether he, prisoner, was not a blacksmith, and had control of the shop, and whether deceased was his striker or apprentice, the Court, on objection taken by the Solicitor General, ruled out the testimony, stating that a negro, although a blacksmith, could not have control of a shop.

4. Because the Court ruled out the testimony of John, by which the prisoner proved that about an hour before the killing prisoner said he intended to whip deceased for disobeying him as foreman of the shop.

5. Because the jury found contrary to law and evidence.

### EVIDENCE FOR THE STATE.

BILL, a slave, says: He, prisoner and deceased were coming from down town; heard prisoner and deceased quarreling; prisoner struck four licks; deceased asked prisoner if he was going to kill him for nothing; prisoner told deceased to get up and go to the shop; Mr. Greer and witness went to where deceased was, and carried him over to Mr. Greer's house; did see prisoner at that time; was out there before Mr. Greer went over; came over to the house, and he and Mr. Greer went over together; heard deceased say, "Henry, are you going to kill me for nothing;" saw prisoner when he went over, and prisoner ran off; prisoner was near deceased; deceased said nothing; it was at Town's shop, in Albany; prisoner struck deceased with an axe-handle.

CROSS-EXAMINED—Prisoner and deceased were coming from the baker shop, witness on opposite side of the street from them, and was coming from a room he had to clean up; as witness was at Greer's gate, deceased turned the corner of the fence, opposite Greer's gate; it is a close fence; deceased turned round the corner to do his business; witness went there when he heard them quarreling; it was between seven and eight o'clock, as near as he could come at it; it was not a moonlight night, nor was it very dark; was at Greer's gate when he first heard the quarreling; could distinguish a man twenty yards; saw prisoner very plainly strike deceased; saw the axe-helve plainly, it was wide but thin; was not

more than fifty feet from where he was standing to the shop; when he went over to the shop saw Fanny Thorne standing in the road, near the shop, at the time the fight took place; two licks were struck before he went to Greer's gate; Greer was in his piazza when he got to gate, and came out and went over to where the fight was going on; it was hardly twenty minutes from the striking the two first blows to the time Greer went over; witness went round to the corner when he heard the quarreling; deceased was sitting down when the first lick was struck; deceased fell on his face; prisoner struck him after he was down; prisoner was standing in front of deceased when he struck him, and very near him; struck deceased with the thick end of the stick; the face of deceased was towards the shop when he was sitting down.

JOHN, a slave testifies: I was passing by Mrs. Warren's, and heard Gilbert say, "O Lord, Henry, you have killed me for nothing; you accused me of that I did not do." Heard another lick struck; went half way from Mrs. Warren's house to the shop; did not see anybody. I thought Henry was whipping Gilbert, and that Gilbert had got away and run off; had fodder, and the cows were trying to get it, is the reason he did not go nearer.

CROSS-EXAMINED—It was about dark he heard the fight; could see any one in the street thirty yards; was at the shop between four and five o'clock that afternoon; saw Gilbert going down town; Henry was very drunk; staggering about; could smell the whisky. Henry and Gilbert had a quarrel that afternoon; Henry accused deceased of eating his chicken, and Gilbert denied it; Henry said he would whip him for it, and Gilbert said he could not do it; Henry offered to bet two dollars that he could whip him. Saw Gilbert on his return from Mrs. McGwier's; Gilbert told him that Henry had taken two dollars from him, and he was going to see Mas John about it. Witness went to Henry and tried to get the money for Gilbert, but could not; Henry said he would not give up the money; that he would go to see Mas John too; witness told him he was drunk and had better not go. Henry

closed the shop, and he and Gilbert started to see Mas John. Mr. John Davis was the person they alluded to. This was between sundown and dark; it was about half an hour between the time of their leaving the shop to see Mr. Davis and the fight. Henry was very drunk when he started off from the shop.

RICHARD TOWNS, deposes: Prisoner stated to him that he struck deceased with an axe-handle. Witness asked prisoner if he was drunk at the time of the killing, and he refused to answer. Witness then asked prisoner what he struck deceased with, and prisoner answered he struck him with an axe-handle.

J. P. JETER, sworn: Is Marshal of the city of Albany. Gilbert was killed last Saturday night, three weeks ago; searched for Henry two or three days. Prisoner worked at the shop, but at night usually stayed at the house of John Davis.

Dr. JOHN B. GILBERT, testifies: Saw deceased about an hour after he received the blow; the wound was on the left side of the forehead, and deceased was laboring under concussion of the brain; he could not speak; never spoke afterwards; thinks the blow produced death; the skull was flatened and driven in; he remained in that condition about twenty-six hours and then died.

CROSS-EXAMINED—The skin of the head was not broken. I examined and shaved the head; there is a good deal of difference in skulls, the bones in some are softer than in others; the skull of deceased was of usual thickness and appeared to be hard; was not satisfied upon first examination that the skull was broken; did not examine the body; did not see but one wound; the fracture was in two directions, one three or four inches, the other about one inch and a half running to a point.

RE-EXAMINED BY STATE—An ordinary axe-handle, in the hands of a strong man, would produce death. The skulls of negroes are thicker than those of white persons.

### EVIDENCE FOR THE DEFENCE.

FANNY (a slave) testifies: She heard some person halloe; had just come out from Mrs. Walton's; walked on to the gate; heard some one halloe, "Oh, Lord, killing me here for nothing;" walked on past Mr. Greer's, near Floyd's shop, and heard some one in the weeds; stood about ten minutes; heard some one in the weeds as if they were struggling; heard some one say, "get up from here," twice, but heard no reply; heard some one as if they were trying to pull some one up. Witness started back towards Mr. Greer's, and met Mr. Greer, Peter Hines and Mr. Greer's Bill; did not hear but two licks; was afraid to go near; it was after supper, and witness waited at Mrs. Walton's until the table was cleared off; it was a dark night; could not distinguish persons ten steps; could not see good no how; did not see Bill Greer until she met him with Mr. Greer. Peter Hines told her, next day, that Bill was with him; she recognized Peter because he spoke to her; she neither saw or heard any one, after the first lick, until she met Mr. Greer; was in Mrs. Walton's yard when the first lick was struck; was at the shop on Saturday afternoon; heard no quarreling; was there before the train came in.

RE-EXAMINED—Could not say it was Henry's voice, it sounded like his; when she heard some one say, "get up from here," thought it was Henry's voice, but could not swear so.

WITT, (a slave,) says: He passed by the shop between sunset and dark; Henry had an axe-handle in his hand, and said he was going to whip deceased for stealing the shop keys; witness asked him if he was going to strike deceased with the axe-handle, and prisoner said "no, he was going to whip him;" prisoner was drunk, staggering about; witness was at the shop about twelve o'clock; prisoner and deceased were both there at work.

JOHN A. DAVIS deposes: Prisoner and deceased belonged to the estate of Davis Pace; prisoner is a blacksmith, and deceased was a striker under him; the evening of the fight

deceased told witness that Henry had three dollars of his money; that Henry had accused him of stealing shop keys and stable keys, and that he did not know anything about the keys; deceased stated that prisoner asked him if he had change for five dollars, and he replied he did not know whether he had or not, and pulled out his money to look, when prisoner snatched three dollars from him, and said he would not return it until deceased got the keys; witness told deceased to go to the plantation, and that he would see that he got his money, and would whip Henry besides; deceased appeared to be satisfied, and walked off, and witness thought he had gone home; next saw Gilbert at Mr. Greer's; he had received a blow, could not speak, but seemed to understand every thing that was asked him; witness superintends the business of Pace's estate; saw Henry the Tuesday morning after the fight; his boy waked him up and said Henry was in the yard, and wanted to see him; witness went out to him; he came to witness voluntarily, no white man came with him; prisoner did run away, and witness employed Mr. Jeter to catch him; deceased had worked at the shop the last two years; he stayed at the plantation, prisoner at the house of witness.

RICHARD TOWNS, recalled by State, says: He owns a shop near where prisoner and deceased worked; he saw a tin bucket there the morning after the fight, which resembled one that deceased usually carried; the distance by Sims & Rust's warehouse and by the shop is about equal.

The motion for new trial was overruled on all the grounds taken, and prisoner, by his counsel, excepts.

STROZIER & SMITH, VASON & DAVIS, for plaintiff in error.

L. P. D. WARREN, Solicitor General, *contra.*

Henry, a slave, *vs.* The State.

*By the Court.*—LYON, J., delivering the opinion.

1. The first exception made in the record is to an explanation given by the Court to one of the jurors while on his trial for competency. The juror did not understand the meaning of the term "perfectly impartial," and the Court explained its meaning to his understanding of it. We see no error in this; on the contrary, we think it was the duty of the Court to make the explanation.

2. It is also objected, that while another juror was on trial, and after he had answered the question, whether he had any bias or prejudice against the prisoner, in the affirmative, the Court interrogated the juror as to what he meant by his answer, etc. There was no error in this. The object of the examination is to get impartial, unbiased and unprejudiced jurors to try the cause. The questions propounded to the juror, under the statute, are the tests of the law for the ascertainment of this fact, and it is legitimate in the Court, if he suspects from the examination, the answer of the witness, or otherwise, that the juror does not correctly understand the questions, or the effects of his answer, to sift the juror by other questions and explanations, until the question as well as the answer and its effect is fully comprehended; but the statutory questions, nor the consequences of a negative or affirmative answer thereto, must not be neglected when the question is fully understood and fairly answered.

3. Whether a negro slave can control a blacksmith shop, under the laws of this State, is not so clear. There is no express statute, so far as we know, expressly prohibiting it; but from the restrictions, placed by different statutes, on slaves, for the proper discipline and subordination of that class of our population, we are inclined to think such an act in conflict with the general policy of the State on this subject. He, the slave, is not permitted to go off the plantation of his owner, without a permit. He cannot rent or hire a house to be used or occupied by any slave. Cobb Digest, 980. , They are not allowed to learn to read or write; nor are they permitted to labor for themselves, even with the permission of the owner.

Cobb New Digest, 984. If he cannot do any of these things, it certainly could not have been within the intention of the Legislature that he should control a blacksmith shop, or any other shop, and carry on and conduct the business thereof. Hence, we think there was no error in the ruling out evidence of this fact; for if the prisoner did control the shop, such control was illegal.

4. Was the evidence sufficient to support the verdict of murder? We think that it was not. There was a quarrel between the accused and the deceased, originating more in the drunkenness of the accused than from any apparent provocation by the deceased. He, it seems, was a striker for the prisoner, who felt, in consequence, that the deceased was under his control, and that he had the right to chastise him. This was the whole extent of the prisoner's intention. He designed nothing more, and in the execution of such purpose, he beats the deceased with an axe-helve, a very improper instrument for that purpose, it must be confessed. Two blows are given —one witness says four—and death ensues. Is this murder? We cannot think that it is. There is no malice, no design on the life; and to bring the case within the presumptions of the law as to malice and intent, the State attempts to show that the weapon used was one likely to produce death. The effort was not successful. The axe-helve used was not exhibited, and the only evidence we have as to its character is the loose statement of a contradicted negro witness, not on this point, however, that the axe-handle was wide but thin, and that the accused struck with the thick end of the stick. This is all we have as to this particular axe-helve, and that, too, as seen by the negro in the dark; and then we have the testimony of the witness, Dr. Gilbert, as to the force and effect of axe-helves generally. He says an *ordinary axe-handle* would produce death, *in the hands of a strong man.* Was this an ordinary axe-handle. We have no evidence that it was. That it *would* produce death is clear; for it did so in this case; but was it a weapon likely to produce death? that's the point—on an occasion when it was not used for that pur-

pose, with no design to kill, but with the sole object, as the negro repeatedly said, of whipping the deceased.

Believing, as we do, that the evidence is insufficient to make out a case of murder, we think that the Court below ought to have granted a new trial on the ground taken that the verdict was against law and the evidence.

Let the judgment be reversed.