## KENNEDY *v.* THE STATE.

No. 13280.   OCTOBER 16, 1940.

*D. C. Jones,* for plaintiff in error.

*Ellis G. Arnall, attorney-general, W. G. Neville, solicitor-general, Fred T. Lanier, E. J. Clower* and *C. E. Gregory Jr., assistant attorneys-general,* contra.

BELL, Justice.  L. A. Kennedy was indicted for the offense of murder in the alleged killing of John Woodward, by "striking, hitting, and beating the said John Woodward with a certain glass bottle."  He was convicted of the offense charged, with recommendation "that he be imprisoned for the remainder of his natural life."  His motion for new trial was overruled, and he excepted. The evidence showed that on Saturday night, July 29, 1939, there was a dance at Zetterower's filling-station and dance-hall, in Bulloch County.  The defendant went with his wife and children, in an automobile, to this dance.  Among others who attended the dance were the deceased John Woodward, Dennis Hodges, and Lewis Akins.  The evidence tended to show that as the evening passed Kennedy became intoxicated.

Lewis Akins testified:  "I was there when the dance broke up that night.  When I came out of the dance-hall after the dance was

over I stood around there a few minutes, and cranked this boy's, L. A. Kennedy's, car for him. How came me to have anything to do with the cranking of the car was his wife wanted me to crank it, as she wanted to go home. How she got the car away from there was, I got in the car and cranked it myself. John Woodward and Dennis Hodges pushed the car off, and I cranked it. They pushed it just a few steps down the hill. When the motor started the defendant's wife got out on the running board of the car and went to the schoolhouse, and I got out, and she got under the wheel and went on and left. When John Woodward, Dennis Hodges, and the defendant's wife were pushing the car and I was at the wheel, the defendant walked back towards the store, towards the filling-station. When they started to push the car off, he walked to Lehman Zetterower's store." The witness further testified: "I heard a conversation between L. A. Kennedy and his wife before Mrs. Kennedy left there in the car. She asked him to let's go home, and he refused to go, and I cranked it up and drove it off for her myself. When I walked back up to where Dennis and L. A. were, I did not hear anything particular said about starting the car. As his wife drove off with the car I don't know what L. A. Kennedy did, as at that time I was down to the schoolhouse with the rest of them. When his car cranked up I did not hear him say a word; he walked back to the store."

Dennis Hodges testified that "the reason why it was necessary to push that car off was that the starter would not pull it." As to whether the defendant was present at that time, the witness did not see him. After the defendant's wife and children had gone, the witness and John Woodward walked to the latter's car, which was sitting in front of the filling-station. As to what occurred at this time, the witness testified: "He [John Woodward] started to get in the car on the left-hand side under the steering-wheel, and I started to get in on the right-hand side, and just about four feet from the car L. A. came from the filling-station (by L. A. I mean L. A. Kennedy), and struck John Woodward with a bottle— I do not know what kind of a bottle it was, and John Woodward staggered across the road. He was already across the road and went back of the car and had both of his hands like this [indicating hands holding head], and staggered into the weeds. . . I did not see John Woodward any more that night after that. I turned

and looked at L. A. Kennedy as he hit John, and John staggered by me, and then L. A. Kennedy started on to me with a bottle. I met him and we tussled in the woods [weeds?] and the bottle struck me on this side of the head [indicating], and I hit him with my fist, and we went to the dirt, and then he struck me on the chin with the bottle. That lick made a sign on me; and there is the scar now [indicating] ; it is there now, the same scar. After we got up Jessie Ballard came up and pulled L. A. Kennedy off, and L. A. said, 'Who gave you permission to push my car off?' I said 'Lewis Akins asked me to push it off.' We talked on, and he said, 'Are you satisfied about the fight?' and I told him, 'Whenever you get sober and my back gets well we will have the fight over.' He said, 'If you are not satisfied about it, all right,' and we went together again for another fight. As we went down he got on top, and then we got up, and we were standing there talking, and Lewis came up about that time, he came up from the direction of the wagon, and he said, 'L. A., I pushed your car, and what are you going to do about it? I cranked your car, and what are you going to do about it?' and he sort of laid his hands on L. A.'s shoulder and shoved, and about that time our wives [and others named] came up there, and my wife asked me how come I was bleeding, and about that time L. A. Kennedy turned and come off toward Robert Aldrich's filling-station. . . I did not see the defendant any more that night. I had no way of knowing about what time we all left there; it may have been one o'clock or may have been two o'clock. It was late in the night. . . There had been no disturbance there that night between any of these folks before the car was pushed off, as I know of. There was no row between me and Woodward or between Akins and Woodward or Kennedy and Woodward until that time. It could not have been more than two or three minutes after the defendant's wife carried the car off with our assistance before he came up and hit Woodward and struck him; it was a short time. After I and the help I named pushed the car off I did not see Kennedy, the defendant, any more until he came to where we all were. He had not said anything to me from the time the car was moved until I said he struck John Woodward."

On cross-examination the witness testified: "As to whether I said that as John Woodward got hit he was on one side of John Woodward's car and John was on the other side, he was just going

up to the back of the car, John Woodward was. I was on the right-hand side of the car; I was not quite to it; lacking about four feet. I was nearest to the right-hand back fender, and John was closest to the left-hand side back fender. The car was not exactly between me and John Woodward. The car was in front of us; we had not quite got to the car. As to whether I said that John Woodward was fixing to get in the car under the wheel, he was going to that side of the car. I do not know where John Woodward was going; he was going to take me to the schoolhouse, to the Denmark schoolhouse where the wagon was. . . The moon was shining very bright that Saturday night. When L. A. Kennedy came up to John Woodward and struck him he did not say a word. All he did was to walk up to where John Woodward was at and hit him with a bottle. He hit him right across the head somewhere. When he hit him John was walking toward the car, and L. A. came on the left side of him and hit him. As to whether he came up like John was going this way toward the car and L. A. came this way on the left-hand side [indicating], John Woodward staggered to the right of L. A. Kennedy. When L. A. Kennedy struck him he was to the side of John, sort of this way [indicating]; he stepped around more in front of him than he was behind of him, and got in front of John Woodward, and then he struck him on the left side of his head, and John sort of turned his head like that [indicating]. John must have seen him. John Woodward did not say a word to L. A. Kennedy." In describing the bottle, the witness stated that it was a round bottle "about seven or eight inches long. . . It was some kind of a drink bottle, a beer bottle or a coca-cola bottle."

The dead body of John Woodward was found the following morning about fifty or sixty yards from the filling-station and dance-hall. Dr. C. E. Stapleton, a physician, testified that he saw the body about 7:30 o'clock that morning, and on examining it he found a lick on the left side of the head, "just opposite to the ear, that broke his skull . . presumably with a blunt instrument;" that after an incision had been made by the undertaker, "we found that the skull was fractured; that it was crushed in. The effect that that had when the skull was crushed in was, it caused a hemorrhage of the brain. It burst a blood vessel internally, and he had a hemorrhage of the brain, and it killed him." The witness

did not think the blow would have produced instant death, but that Woodward "probably lived at least three or four hours." The body was still warm at the time it was examined by Dr. Stapleton. Robert Aldrich testified that some time after midnight the defendant Kennedy came to the filling-station and asked the witness to take him home, and stated "that he had hit one son of a bitch and hadn't seen him since." On being recalled, Aldrich testified that he asked the defendant, "What did it start about?" and that the defendant replied, "Pushing my car off, and I told them not to."

The defendant introduced no evidence. In his statement he denied that he had killed John Woodward, or that he had struck either him or Dennis Hodges with a bottle or other instrument. He stated that he and Woodward were good friends and had never had any trouble; that he had nothing against Woodward and so far as he knew Woodward had nothing against him. He denied making the statements attributed to him by Aldrich. He admitted having a tussle with Dennis Hodges, but stated that there was no bottle around, that he did not even see a bottle, and that he did not see John Woodward from the time they came out of the dance-hall.

The defendant's motion for new trial was based upon the general grounds and on special grounds added by amendment. The contentions thus made will be dealt with in the following opinion.

■ The court charged the jury as follows: "I charge you, gentlemen, that there can be but one of three verdicts rendered in this case, which are these: 'We, the jury, find the defendant guilty;' second, 'We, the jury, find the defendant guilty, and recommend that he be punished by imprisonment in the penitentiary for and during his natural life;' and third, 'We, the jury, find the defendant not guilty.'" This charge was assigned as error, "because it illegally restricted the jury in said case [to] finding one of three verdicts, when, as a matter of law under the evidence in said case, the jury could have returned a verdict different from the ones the court instructed them that it could only return, and could have found the defendant guilty of a minor offense embraced in the major offense alleged in the indictment." The court did not err in overruling this exception. It is too general and indefinite as to what different verdict the jury would have been authorized to render, and as to what minor offense the charge excluded. *Smith* v. *State*, 125 *Ga.* 300 (54 S. E. 124) ; *Bradford* v. *State*, 151 *Ga.*

334 (106 S. E. 718); *Williams* v. *State*, 176 *Ga.* 372 (168 S. E. 5); *Harris* v. *State*, 184 *Ga.* 165 (190 S. E. 554); *Norris* v. *State*, 184 *Ga.* 397 (191 S. E. 375). While the State has made no attack upon the assignment of error, still, under the foregoing decisions and others which might be cited, it is manifestly insufficient to present any question of error for determination. Any other view would require an examination of the evidence as to every possible lesser offense that might be included within the indictment, whereas under the settled rules of practice the movant should at least have specified what particular offense or offenses he contended were excluded. In thus holding that the assignment of error is too general and indefinite, no intimation is intended as to whether any lesser grade of homicide was involved under the evidence.

■ The movant assigned error on the failure of the court to charge to the jury stated principles of law relating to the offense of assault and battery. It is contended that this lesser offense was included within the indictment, and that under the evidence a conviction of assault and battery would have been authorized. There is no merit in this ground. The evidence for the State, if credible, showed that the defendant struck the deceased on the side of the head with a bottle, and it appeared without dispute that the wound thus inflicted resulted in death. "No person shall be convicted of an assault with intent to commit a crime, or of any other attempt to commit any offense, when it shall appear that the crime intended, or the offense attempted, was actually perpetrated by such person at the time of such assault, or in pursuance of such attempt." Code, § 27-2508. Since the deceased came to his death as a result of the blow by whomsoever given, the defendant could not lawfully have been convicted of the offense of assault and battery. See *Clements* v. *State*, 141 *Ga.* 667 (4) (81 S. E. 1117); *Coggeshall* v. *State*, 161 *Ga.* 259 (5) (131 S. E. 57); *Brooking* v. *State* 33 *Ga. App.* 49 (125 S. E. 504).

■ The court charged the jury as follows: "The law presumes malice from the use of a deadly weapon when it is used in a manner likely to produce death, with the intent to kill, and without justification or mitigation." The movant assigned error upon the grounds: (1) there was no evidence from which the jury could infer that the weapon alleged to have been used by the accused was a deadly weapon or one likely to produce death when used in the manner

shown by the evidence, and (2) the charge in effect instructed the jury that the instrument was a deadly weapon and was used in a manner likely to produce death. It is true that the bottle in question was not introduced in evidence. It was described by a witness as a round bottle "about seven or eight inches long. . . It was some kind of a drink bottle, a beer bottle or a coca-cola bottle." This without more might or might not have been sufficient to show that the weapon was one likely to produce death. There was other evidence, however, to be considered by the jury upon this question. According to the testimony of Dennis Hodges, the defendant stepped in front of John Woodward and "struck him on the left side of his head," and Woodward "staggered out into the weeds," and died in a few hours. Dr. Stapleton testified that the deceased had been struck in the left temple with a blunt instrument, that his skull was fractured and crushed in, that the wound caused internal hemorrhage and resulted in death. An instrument may be shown to be a weapon likely to produce death, "by direct proof as to the character of the weapon, by an exhibition of it to the jury, or by evidence as to the nature of the wound, or other evidence such as would warrant the jury in finding the instrument was one calculated to produce death." *Paschal* v. *State*, 125 *Ga.* 279, 280 (54 S. E. 172). The evidence need not be direct, but may be circumstantial. In the present case the evidence as to the nature of the wound and the other circumstances was sufficient to authorize a finding that the bottle was a weapon likely to produce death when used in the manner in which it was shown to have been used on this occasion. *Monday* v. *State*, 32 *Ga.* 672 (5) (79 Am. D. 314) ; *Paschal* v. *State*, 68 *Ga.* 818; *Thornton* v. *State*, 107 *Ga.* 683 (6), 689 (33 S. E. 673) ; *Moran* v. *State*, 120 *Ga.* 846 (48 S. E. 324) ; *Nelson* v. *State*, 4 *Ga. App.* 223, 225 (60 S. E. 1072) ; *Merritt* v. *State*, 19 *Ga. App.* 616 (91 S. E. 885).

Nor is there any merit in the second contention relating to the foregoing charge; that is to say, the charge did not have the effect of instructing the jury that the instrument was in fact a deadly weapon, or that it was used in a manner likely to produce death. It merely stated a proposition in the abstract; and whether sound or unsound in principle, it did not tend in any degree to express an opinion as to what had been proved, or to instruct the jury upon the facts of the case, as contended by movant.

■ The defendant complained of the following charge: "A reasonable doubt is such a doubt as must arise from a candid and impartial consideration of the evidence in the case." This charge was not erroneous, as contended, for the reason that such a doubt may arise from lack of evidence or from the defendant's statement; the court having fully instructed the jury as to the right of the defendant to make a statement and as to the force and credit which might be given to it by ¹he jury. *Walker* v. *State*, 118 *Ga*. 34 (44 S. E. 850); *Thomas* v. *State*, 129 *Ga*. 419 (4) (59 S. E. 246); *Daniels* v. *State*, 162 *Ga*. 366 (133 S. E. 866). The decision in *Governor* v. *State*, 5 *Ga*. *App*. 357 (2) (63 S. E. 241), does not require a different conclusion.

■ The following testimony of Lewis Akins, a witness for the State, was admitted over objection by the defendant: "Q. Did L. A. Kennedy's wife try to get him to go home with her? A. Yes. Q. Did you hear a conversation between the defendant and his wife at the time his wife was leaving? A. Yes. Q. State what he said, and was was [what was?] said? A. Well, she asked him to let's go. Q. State what it was. A. She asked him to let's go home, and he refused to go, and I cranked it up and drove it off for her myself." This testimony was objected to at the time it was offered, on the following grounds: (a) It is without probative value, in that it does not elucidate any issue in the case; (b) it does not relate to the crime charged; (c) the wife was an incompetent witness to testify either for or against her husband; (d) the evidence was not a part of the res gestæ, and did not tend to show motive. The admission of this testimony is complained of in the motion for new trial. There is no merit in this complaint. There was other evidence to the effect that the defendant became angered with the deceased because he had assisted the defendant's wife in getting the automobile started, and the testimony objected to was relevant as further tending to show motive. *Wall* v. *State*, 126 *Ga*. 86 (4), 88 (54 S. E. 815); *Boone* v. *State*, 145 *Ga*. 37 (88 S. E. 558); *Wheeler* v. *State*, 179 *Ga*. 287 (175 S. E. 540). The evidence related to a conversation between the defendant and his wife, and was not inadmissible on the ground that the wife could not testify as a witness against her husband. The wife was not offered as a witness, and the rule as to incompetency did not apply. *Williams* v. *State*, 139 *Ga*. 591 (77 S. E. 818); *Hudson* v. *State*, 153 *Ga*. 695 (113 S. E. 519).

The movant contended that he was entitled to a new trial, because G. T. Waters, one of the jurors who returned the verdict against him, was related within the prohibited degree to B. F. Woodward, the prosecutor. This ground of the motion was accompanied by affidavits of movant and his attorney, to the effect that they both exercised proper diligence, and did not learn of the relationship until after verdict. The State offered in rebuttal affidavits which tended to show that while the jury was being selected, J. E. Rushing, another juror whose name was called, arose and stated that he was related to the prosecutor, explained the relationship, and was excused. Following this, G. T. Waters, who is the juror in question, stood up, and in open court, in the presence of the defendant and his attorney, stated "that he, the said G. T. Waters, might be related if Mr. J. E. Rushing was related, for the reason that the mother of the said G. T. Waters, said juror, was a sister of Mr. Morgan, the father of Mr. J. E. Rushing." An affidavit to this effect was made by B. F. Woodward, the prosecutor. The affidavit further declared: "With that statement the juror [Waters] sat down, and some one in the court-room said that the relationship was too far removed. Nothing more was said about the disqualification of the said G. T. Waters, and he remained on the jury trying said case." Other and similar affidavits, including one made by Waters, were introduced in evidence. A second affidavit by the defendant's attorney was introduced for the purpose of rebutting those offered by the State. This affidavit was as follows: "Deponent says that after G. T. Waters, a juror trying the above-stated case, had been selected as one of the trial jury in said case, that the said juror stated that he might be related, and then and there deponent, sole counsel for the movant, inquired of said juror what the relation was, if any, and the juror replied that he did not know. Deponent says that the court had called upon Mr. A. M. Deal, one of the oldest members of the bar, to aid in finding out relationship of jurors to the movant and the prosecutor, and that the said A. M. Deal, after making some inquiry, stated that the said juror, G. T. Waters, was not related within the prohibited degree and so as to disqualify him as a juror in said case. Deponent further says that he did not hear J. E. Rushing make any statement as to the relationship of the said juror whatever, and that he did not hear any one in the court-room make any state-

ment as to the relationship of the juror, G. T. Waters, which was calculated to make deponent believe that the said juror was related so as to disqualify him, nor did deponent hear any one present make any statement which would cause deponent to suspicion that such relationship existed; that deponent at the time was not acquainted with the relationship of the said juror nor with the family history of said juror. Deponent was at the time familiar with the history of another branch of the Rushing family in Bulloch County, but did not know that the said juror was in any way related to the Rushing family. If any statement was made by J. E. Rushing or any other person which would have been sufficient to put this deponent on notice that relationship of the juror did exist, the same was not called to the attention of the defendant nor to this deponent as his counsel, and that deponent did all that was required of him to find out the relation of said juror as well as all the other jurors, and made inquiry about the relationship of the jurors in order to find out if any of them was related, and by diligent effort did not and could not find out about the relationship existing between the said G. T. Waters, a juror in said case, and the prosecutor."

Although the juror may have been disqualified as contended, it does not necessarily follow that a new trial should have been granted. In *Moore* v. *Farmers Mutual Insurance Asso.*, 107 *Ga.* 199 (2), 209 (33 S. E. 65), it was said: "When parties are furnished with a list of the jury it is their duty, if they know that any of the jurors are disqualified, to call attention to the same, or the disqualification will be held to have been waived. If they have reasonable grounds to suspect that any of the jurors are disqualified, it is their duty to call attention to the fact, so that due inquiry may be made of the panel." Under all the evidence introduced, the presiding judge, sitting as a trior, was authorized to find that the defendant and his attorney were put on notice of probability of disqualification, and that they waived it by failure to make or request further investigation. It can not be said that the judge abused his discretion in overruling this ground of the motion. See Code, §§ 59-804, 37-116; *Buchanan* v. *State*, 118 *Ga.* 751 (8) (45 S. E. 607); *Wynn* v. *State*, 181 *Ga.* 660 (183 S. E. 923); *Kennedy* v. *State*, 20 *Ga. App.* 752 (93 S. E. 233); *Edenfield* v. *Youmans*, 33 *Ga. App.* 430 (126 S. E. 908).

■ In the one remaining ground, the movant contended that J. H. Ginn, one of the jurors before whom the case was tried, was not perfectly impartial, in that he had previously made the statement, "I believe there were others into it besides L. A. Kennedy." In support of this ground the defendant introduced an affidavit made jointly by two persons. The State introduced an affidavit from the juror, in which, after referring to the statement so attributed to him, he declared, "that he does not recall exactly the words said, but that in relating what other parties were reported to have said deponent may have casually remarked that from the reports others might be involved. Deponent says that prior to the time he was selected to serve as juror in the trial of said case he had not heard any evidence of any kind for or against movant, that deponent was not present in Statesboro at the time a preliminary hearing was had for others charged with the killing of John Woodward, that deponent knew nothing of the facts and surroundings, and that in serving on the jury trying said case he did so fairly, impartially, without any bias or prejudice of any kind for or against movant, and that the verdict in said case was reached in the light of what deponent felt like was his conscientious duty, under his oath as a fair and impartial juror, under the sworn evidence in the case, and under the law as given in charge [by] the court." Under the evidence adduced, and especially in view of the counter-showing, the judge, again acting as trior, did not abuse his discretion in finding that the juror Ginn was not disqualified. *Hill* v. *State*, 91 *Ga.* 153 (3) (16 S. E. 976); *Wilburn* v. *State*, 141 *Ga.* 510 (3) (81 S. E. 444); *Wynn* v. *State*, 179 *Ga.* 874 (5) (177 S. E. 695); *Rouse* v. *State*, 183 *Ga.* 551 (4) (188 S. E. 904).

■ The evidence for the State was sufficient to show that the defendant struck and killed the deceased without justification, mitigation, or excuse. The defendant by his statement declared that he did not strike the deceased or have any trouble with him. The jury accepted the evidence for the State as representing the truth of the transaction. Under the evidence, including that as to the character of the wound and the result, the jury were authorized to find that the instrument was a weapon likely to produce death, and that its use was attended with implied malice. Code, § 26-1004. As to presumption of malice, see *Warren* v. *State*, 140 *Ga.* 227, 229 (78 S. E. 836); *Mann* v. *State*, 124

■

*Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934); *Godfrey* v. *State,* 135 *Ga.* 571 (69 S. E. 1080); *Turner* v. *State,* 139 *Ga.* 593 (3) (77 S. E. 828); *Hunter* v. *State,* 147 *Ga.* 823 (3), 828 (95 S. E. 668); *Fitzpatrick* v. *State,* 149 *Ga.* 75 (3) (99 S. E. 128); *Gaillard* v. *State,* 149 *Ga.* 190 (99 S. E. 629); *Marcus* v. *State,* 149 *Ga.* 209 (99 S. E. 614). The evidence did not demand a finding that the bottle was hastily seized or picked up and used by the defendant with no intention to kill, as in *Jordan* v. *State,* 124 *Ga.* 780 (53 S. E. 331). On the question here under consideration, that is, whether the verdict finding the accused guilty of the offense of murder, is supported by the evidence, the case also differs in material respects from the following cases, relied on by the plaintiff in error: In *Ray* v. *State,* 15 *Ga.* 223 (5), the evidence showed a mutual intention to fight, and the decedent was approaching the prisoner in furtherance of this design. The defendant accidentally and hastily picked up a board, with which in the conflict he inflicted blows that produced death. The defendant was convicted of murder, and the judgment was reversed apparently on the theory that the evidence did not establish more than voluntary manslaughter. No such facts appeared in the instant case. In *Taylor* v. *State,* 108 *Ga.* 384 (3, 4) (34 S. E. 2), the decision, so far as here material, related to refusal of requests to charge, and not to sufficiency of the evidence to support the verdict. In *Henry* v. *State,* 33 *Ga.* 441, a verdict convicting the accused of murder was set aside on the theory that the evidence was insufficient to prove the crime of murder; but in that case it was held in effect that the positive or direct evidence showed *affirmatively and without dispute* that the only purpose of the accused was to whip the deceased. There was no such positive or direct evidence in the present case. The *Henry* case thus being clearly distinguishable, further comment is unnecessary; but really is the decision not unsound as failing after verdict to allow due weight to the circumstantial evidence? Compare the decisions cited in division 3, supra. The court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur.*