1. Affidavit in forma pauperis held, not legally sufficient to relieve against cost payment.
2-4. Evidence showing that a knife with which the accused intentionally stabbed the deceased was an instrument likely to produce death, the law of involuntary manslaughter was not involved.
5. If the statement of the accused on trial could be construed as raising an issue of involuntary manslaughter, the court's omission to charge the jury on that theory was not erroneous in the absence of a proper request.
6. Conviction of murder was authorized by the evidence.
 No. 13723. MAY 15, 1941.
Roy Banks was convicted of murder, with a recommendation to mercy. He made a motion for new trial on the general grounds, and on the ground that the court failed to charge the law of involuntary manslaughter as defined in the Code, §§ 26-1006, 26-1009. This motion was overruled, and the defendant excepted.
The State's evidence was in substance as follows: The defendant, having just returned from serving a chain-gang sentence, was invited to eat dinner at the boarding-house of Mrs. Fuller. At the dinner, which was about mid afternoon, there were present the defendant, Jack Sills, later deceased, John Gartrell, and Mrs. Fuller. The defendant said, "I am an expert carver, and I will do the carving of the chicken." It was at this house that the killing occurred several hours later, when the defendant stabbed Jack Sills with the knife used by him in carving the chicken. After they finished dinner the defendant said he would like to go and see his mother. Gartrell said he would take him, but must go first to another home. The two went to the other home, came back, and they and the defendant's wife and Mrs. Fuller then went to the home of the defendant's mother. Mrs. Fuller and Gartrell stayed in the car while the defendant and his wife were inside the home. Presently the defendant's wife came out and called to Gartrell to come quick. He went in and found the defendant cursing his mother, his brother, and his sister, saying that they sent him to prison. Gartrell remonstrated with him for talking thus to his mother. Then the defendant, his wife, Gartrell, and Mrs. Fuller, got in the car and drove off. Gartrell suggested that they had time to go to a show, but the defendant did not care to go to a show, and suggested *Page 182 
two or three places, and there they went, some of them taking refreshments where they stopped. Finally they came back to the home of Mrs. Fuller, where Jack Sills, the deceased, had remained. The door was closed; and upon knocking, Sills said, "Wait a minute," that he would come and open the door. Defendant's wife then said she would go to a bathroom in a home near by, where she had been living while her husband was in prison, and would return. She and the defendant had been invited to spend the night at Mrs. Fuller's, and were also invited to spend the night at the near neighbor's home. The door was opened at Mrs. Fuller's, and the persons entered, except the defendant, who said he would go and see what had become of his wife. Later his wife came back alone to Mrs. Fuller's, and went back to a bedroom in the house. Jack Sills was in the house. Then Banks, the defendant, came. Jack Sills opened the door, and Banks walked by him, neither speaking a word. Banks went into a bedroom, and Sills followed him. Without a word being spoken, the defendant cut Sills. Gartrell grabbed him and shoved him back; whereupon the defendant said, "Look out, I will cut you too," but he made no effort to cut him. The State's witnesses did not mention a harsh word passing between the defendant and Sills up to that time. The knife used by the defendant was the knife used by him in carving the chicken earlier in the day, and was put in evidence. It belonged to Mrs. Fuller. The picture of it taken alongside of a ruler shows it to have a blade about three and three-fourths inches in length, and the handle about the same length. Mrs. Fuller called it her "butcher knife."
The assignment of error on the court's omission to charge the jury on the law of involuntary manslaughter is based on the foregoing evidence for the State and lengthy excerpts from the testimony of witnesses for the defendant, who occupied homes near by, as well as the entire statement of the defendant. One of these testified: "I remember when Jack Sills died from knife wounds. I never will forget it. It was between ten and twelve o'clock. I was up on account of sickness. I saw the boy go up the steps. I saw Roy Banks go up the steps to the door, and the door was latched. He called for Ruth [his wife] several times, and shook the door and kept calling for her. I would not know how long he stood there, and at last this man came to the door and unlocked it. *Page 183 
There were three latches on that door. Mr. Sills unlatched the door. He undone that one, and that one and that one, and when he had undone the last one the door came open, and they went together. There was one stroke made, and it looked like Roy [the defendant] got him by the arm, and they disappeared out of my sight. They went into a tussle, and they went out of my sight in a tussle." Another testified: "Roy went over to get her, and could not get the door open. Johnny [Gartrell] came to the door and said, `She is not here,' and Roy kicked the bottom of the door, and Johnny grabbed at him, and Roy shoved him through the room, and Jack came through another door, and Roy reached and grabbed his hand, was all I could see. They went into the back, and in a few minutes Jack staggered off of the wall, and I went and called the ambulance and the police. . . I had seen Mrs. Fuller at the time of the cutting or right after. She was drinking — she was drunk. . . I saw Roy go on that porch, and saw him when he knocked and asked if Ruth was in there. Johnny said that she was not, and Roy said she was, and he [Johnny] said `I know damn well she ain't;' and Roy said, `If you don't open this God damn door I will go and see,' and he hauled off and kicked the bottom of the screen door, and Johnny said, `Wait, I will open it.' I don't know whether he opened it or not, but he was standing in the door. That was Johnny. It was not Jack Sills. I am sure of that. When Johnny opened the door I could not see Jack Sills right then. When the door was opened, Roy started in the door and Johnny grabbed him. Jack Sills did not grab him, not right then. He was standing like this, and Johnny shoved him all the way back. At that time I had not seen Jack Sills in the house. The next thing I saw, Jack Sills came out of the room on the right-hand side and grabbed at Roy. I could not tell you whether he grabbed him or not. I next saw Roy Banks coming out the front door with Ruth, and knocked her down off the step. I don't know whether he hit her with his fist or not, but she fell off the steps. He did hit her. I would not say whether he kicked her in the posterior part of her anatomy or not. He then turned up Tumlin Street, and Ruth went with him." Another testified: "I was at home on the night this cutting took place. The first time I knew that there was trouble, I heard Roy call Ruth, and knocked on the door and asked them to let him in, and they would not let him in, and *Page 184 
he kept on about fifteen minutes trying to get in — he kept on kicking at the door, and finally they let him in, and then they commenced fighting. I don't know what happened after they got inside the door. When he walked in, it looked like Jack was cutting at Roy. After that I saw Roy bringing his wife out, and I saw Jack lying in the street; and that's all.
The movant relied also on his statement to the jury, in part as follows: "And I took my foot and kicked the screen like that, just an ordinary kick. I was not mad with any one. It looked like it took them a long time to get to the door. When I walked in — Jack opened the door — there were three latches on the screen door. He pushed the door wide open with his foot, and made a pass at me with that knife and cut the end of this finger, and cut me on the cheek. I finally knocked the knife out of his hand and reached down and got it with my right hand, and went in, and Johnny and this other woman were in the kitchen, and Ruth was on the middle bed, lying down. Jack took another run at me, and Johnny started out of the kitchen with a brick, and he had me by the neck, and when I saw Johnny coming out of the kitchen with a brick I stabbed him and throwed the knife down. . . That's all I can remember. That's all there was to it. I had no hard feelings against Johnny or no one. It looked like they were trying to take advantage of me, because I had just come there and had no money. When I knocked on the door the last time, he met me with that knife."
1. The pauper affidavit transmitted with the record to the Supreme Court was as follows:
"The State of Georgia vs. Roy Banks.
"Personally appeared before the undersigned said defendant, who on oath says that he is because of his poverty unable to pay the costs or give the security otherwise required for supersedeas, and that he is advised by counsel that he has good cause for writ of error. Roy Banks.
"Subscribed and sworn to before me this 24th day of February, 1941. H. Keller Wilson, Notary Public." *Page 185 
There being nothing on or in the paper to indicate where the alleged affidavit was made, what county or State, and no venue being stated, and nothing to show that the officer attesting the same was authorized to administer the oath, the affidavit was insufficient to relieve the plaintiff in error or his attorney from the payment of costs in bringing the case to this court.Dawson v. Dawson, 106 Ga. 45 (32 S.E. 29).
2. An instrument may be shown to be a weapon likely to produce death, by direct proof as to the character of the weapon, by an exhibition of it to the jury, by evidence as to the nature of the wound, or other evidence such as would warrant the jury in finding that the instrument was one calculated to produce death.Paschal v. State, 125 Ga. 279, 280 (54 S.E. 172);Kennedy v. State, 191 Ga. 22 (11 S.E.2d 179).
3. In the instant case the evidence as to the nature of the wound and the character of the instrument used was sufficient to show that the knife with which the accused stabbed the deceased was a weapon likely to produce death. See Kennedy v. State, supra, and cit.
4. It having been shown by the evidence that the accused, by stabbing with a butcher-knife having a blade about three and three-quarters inches in length and a handle of about the same length, using the knife in such a manner as would naturally tend to destroy human life, inflicted the wound from which the deceased died, and that the wound was intentionally inflicted, the case was not one which under the evidence involved the law of involuntary manslaughter. See Brown v. State, 28 Ga. 199;Warren v. State, 163 Ga. 176 (135 S.E. 735); Higgins v.State, 172 Ga. 221 (157 S.E. 643); Benton v. State,185 Ga. 254 (194 S.E. 166); Reed v. State, 168 Ga. 731 (5) (149 S.E. 23); Carter v. State, 171 Ga. 406
(155 S.E. 670).
5. In a supplemental statement the defendant said: "I have never cut nobody, never tried to hurt no one, and never felt like I wanted to hurt nobody. I haven't got anything against those people." Even if the foregoing could be construed to inject involuntary manslaughter, the judge would not be required to charge on that theory, since "If this grade of homicide was involved only under the statement of the defendant, the failure of the judge to charge the law applicable thereto, in the absence of a timely request *Page 186 
for such instruction, does not require the grant of a new trial."Carter v. State, supra.
6. The verdict of murder was supported by the evidence, and the judgment refusing a new trial must be affirmed.
Judgment affirmed. All the Justices concur, except
ATKINSON, Presiding Justice, who dissents from the ruling in the fourth division of the decision, on the principle ruled inDorsey v. State, 126 Ga. 633 (55 S.E. 479).